UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

Civil Action No.

PETITION FOR HABEAS
CORPUS OF EDWARD A. GIVEN

PETITIONER'S MOTION
APPOINTMENT OF COUNSEL

The petitioner, Edward A. Given, moves that the court appoint counsel to represent him, because he is unable to afford to retain his own counsel, and the case is too complicated for a lay person of his education and experience to represent himself effectively.

1. THE PETITIONER IS INDIGENT.

As appears in more detail in the attached affidavit of the petitioner, the petitioner is indigent. His only asset is approximately $60 in his prison account. His only income is $10 per week earned by working in the staff kitchen. With his current income and assets it impossible for the petitioner to retain an attorney.

2. THE ISSUES ARE TOO COMPLICATED.

The petitioner has raised two separate grounds for issuance of a writ of habeas corpus: one, that his commitment was based on the introduction of unreliable hearsay, or totem pole hearsay evidence, without any opportunity to confront or cross-examine the missing witnesses; and two, that the definition of sexual dangerousness used by the Commonwealth to civilly commit him was unconstitutionally vague and overbroad. A brief examination of the law on each of these issues shows that there are meritorious, but complex.

1. The introduction of unreliable hearsay evidence violated the petitioner's right to due process under the Fourteenth and Fifth Amendments.

To prevail on this issue the petitioner must demonstrate that the decision of the SJC was "contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254. Specht v. Patterson, 386 U.S. 605, 610 (1967), clearly established that a defendant in a sex offender commitment case has the right to "be confronted with and cross-examine the witnesses testifying in support of commitment." Lynch v. Baxley, 386 F.Supp. 378, 394 (M.D.Ala. 1974) applying the holding of Specht. This is simple and straight forward, and consistent with other Supreme Court decision in this area of the law: Addington v. Texas, 441 U.S. 418, 427 (1979); and Vitek v. Jones, 445 U.S. 480 (1980). The issue becomes complicated by the SJC's assertion that due process only requires that the hearsay evidence be reliable to justify its admission without giving the defendant an opportunity to confront and cross-examine the witness, whose hearsay statement is being introduced.

The SJC ruled that hearsay and totem pole hearsay contained in the police report introduced regarding uncharged offenses was reliable, because the petitioner had pled guilty to other offenses described in the same police report. Commonwealth v. Given, 441 Mass. 741, 748 (2004). Although Crawford v. Washington, 124 S.Ct. 1354 (2004) was decided while the petitioner's case was under advisement in the SJC; the decision was called to the SJC's attention, and it was cited by both the four judge

majority, and the three judge dissent. <u>Given</u> at 747, n. 9 and 750, n. 1. The majority in the petitioner's case claimed to be following the test for reliability set out in <u>Ohio v. Roberts</u>, 448 U.S. 56 (1980), <u>Given</u>, at 747, n. 9; notwithstanding the fact that <u>Crawford</u> overruled <u>Roberts</u> and criticized the reliability test in Roberts for being "unpredictable." <u>Id</u>. The dissent in citing <u>Crawford</u>, noted that its holding is related to a criminal case, but the logic is equally applicable under the due process protections to civil commitment proceedings. <u>Id</u>. at 750, n. 1.

If this were not complicated enough, there remains the analysis of what due process requires under the clearly established law as stated in <u>Mathews v. Eldrige</u>, 424 U.S. 319, 325, (1976), and its progeny.

There is also the issue of whether the SJC determination that the petitioner's pleading guilty to some of the crimes described in the police report bolsters the reliability of the description of the uncharged crimes involving an unnamed six year old boy in the police report is "unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(1)-(2). There is no evidence which supports this conclusion. There is nothing in the record to indicate that at the time he pled guilty he had even read the police report in question. There is nothing to show that the facts unrelated to the offenses actually charged were presented at the plea hearing. Nor is there any requirement that the petitioner have admitted to all of the facts in the police report relating to the offenses charged much less any offenses uncharged for the court to have accepted his plea of guilty. To the contrary, Mass. Rule 12(c)(5)(A)

Criminal Procedure, specifically provides that a defendant need not admit to every element of a crime charged for the court to accept his guilty plea. So certainly there is no requirement that the defendant admit all of the details of an uncharged crime contained in a police report that the defendant may or may not have ever seen, and which may have or may not have been read at the plea hearing, in order to have his plea accepted. In the absence of evidence showing that he admitted to the uncharged details, just the fact that the petitioner pled guilty is not enough evidence to reasonably determine that petitioner was also admitting to the details of uncharged crimes contained in the police report. Given, at 751. The dissent also suggest that priciples similar to collateral estoppel would bar introduction of the hearsay statements about the uncharged crimes. Id.

    2.   The definition of "likely to engage is sexual offenses" was unconstitutionally vague and overbroad in violation of the petitioner's right to due process.

In order to find the petitioner sexually dangerous under M.G.L. c. 123A, § 1, the jury had to find that the petitioner was "likley to engage in sexual offenses" if not confined to a secure facility. The petitioner's attorney asked the trial judge to instruct the jury that likely in this context means "certain" to reoffend. The trial judge declined to give this instruction, and gave no definition of the word "likely" to the jury. The petitioner raised the issue that the failure to define "likely" in the context of the definition of sexual dangerous person, made the statute vague and overbroad in violation of the due process clause of the Constitution in his direct

appeal to the Massachusetts Appeals Court. The Appeals Court never decided this issue because it ordered a new trial on the grounds that introduction of the police report violated the petitione's right to due process. Commonwealth v. Given, 59 Mass.App.Ct. 390 (2003). The Commonwealth requested further appellate review by the SJC, which reviewed all of the issues raised in the direct appeal. The Appeals Court clearly did not reach this issue. The SJC considered this issue in one short sentence: "None of the remainder of Given's arguments has merit." Given at 441 Mass. (2004).

Neither the Appeals Court, nor the SJC reached the merits of the petitioner's claim that the statute is overbroad and vague without a limiting instruction on the meaning of "likely." Therefore the petitioner is entitled to de novo review of this issue. Norton v. Spencer,    F.Supp.2d    (D.Mass. 2003); Fortini v. Murphy, 257 F.3d 39 (1st Cir. 2001), cert. denied, 535 U.S. 1018 (2002).

In Kansas v. Crane, the Supreme Court stated:

"Kansas v. Hendricks underscored the constitutional importance of distinguishing a dangerous sexaul offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.' 521 U.S. 346, 360 (1997). That distinction is necessary lest "civil commitment" become a "mechanism for retribution or general deterence"—functions properly those of criminal law, not civil commitment. Id., at 372-373 (Kennedy, J. concurring); cf. also Moran, The Epidemiology of Antisocial Personality Disorder, 34 Social Psychiatry & Psychiatric Epidemiology 231, 234 (1999) (noting that 40%-60% of the male prison population is diagnosable with antisocial personality disorder). The presence of what the "psychiatric profession itself classified...as a serious mental disorder" helped to make that distinction in Hendricks. And a critical distinguishing feature of that "serious... disorder" there consisted of a special and serious lack of ability to control behavior.

In recognizing that fact, we did not give to the

phrase "lack of control" a particularly narrow or technical meaning. And we recognize that in cases where lack of control is at issue, "inability to control behavior" will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case. 521 U.S. at 357-358; see also Foucha v. Louisiana, 504 U.S. 71, 82-83 (1992) (rejecting an approach to civil commitment that would permit the indefinite confinement "of any convicted criminal" after completion of a prison term)."

Kansas v. Crane, 534 US 407, 412-413 (2002).

If the jury or finder of fact is going to have a basis for distinguishing a "dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commintment from the dangerous but typical recidivist convicted in the ordinary criminal case, there needs to be some limiting definition of the term "likely to reoffend" in c. 123A. The term "likely to reoffend" can not be left so vague that any previously convicted sex offender is subject to civil commitment at the whim of the jury or fact finder. All sex offenders belong to class of persons of whom 5.3% will commit another sex crime within 3 years of being released from prison. Langan, Schmitt, and Durose, Recidivism of Sex Offenders Released from Prison in 1994, Bureau of Justice Statistics, U.S. Department of Justice, November 2003, NCJ 198281. By constrast 48% of all prisoners released from Massachusetts Prisons are reconvicted within three years of their release. Massachusetts Department of Correction Reasearch and Planning Division, Recidivism of 1997 DOC Inmates, (2003); Governor's Commission on Corrections Reform, Final

Report, June 30, 2004, Scott Harshbarger, Chairman, p. 30. So, in general, sex offenders are distinguished from the "dangerous but typical recividist, by having a reoffense rate that is between 1/9 and 1/10 of the typical criminal recidivist's rate. If the "dangerous but typical recidivist in an ordinary criminal case" cannot be civilly committed, even though he has a 48% likelihood of reoffending within three years, under Foucha, supra, then a sex offender such as the petitioner cannot be civilly committed unless his likelihood of reoffending is sufficiently greater than the "dangerous but typical recidivist in an ordinary criminal case," that the sex offender is distinguished by the greater likelihood of reoffense. While mathematical precision may not possible, at the very least the jury should have been instructed that "likely to reoffend" means that it is more probable than not" that the defendant will commit another sexual offense if not confined to a secure facility. To really distinguish the petitioner from the dangerous but typical ordinary criminal the jury should have been instructed that there is a substantial likelihood that the petitioner will commit another sexual offense, if not committed to a secure facility.

In Commonwealth v. Boucher, 438 Mass. 274, 780 N.E.2d 47 (2002) the SJC addressed the meaning of "likely" as a matter of statutory interpretation. The trial judge in his written decision had found Boucher not sexually dangerous, based on his interpretation that "likely" meant "more likely than not." Id. at Mass. 275. The SJC ruled this interpretation of "likely" was erroneous, and that the court should have:

> "In assessing the risk of reoffending, it is for the fact finder to determine what is "likely." Such a determination must be made on a case-by case basis, by analyzing a number of factors, including the seriousness of the threatened harm, the relative certainty of the anticipated harm, and possibility of successful intervention to prevent that harm."

Id. at 276. Although the court's analysis of the term "likely" is crouched in an examination of the legislative intent in using the term, the court did cite Hendricks, and concluded that:

> "There is little question that, in the circumstances of our statute, proof that a person is likely to commit another sexual offense need not be established to mathematical certainty above fifty per cent in order to distinguish the dangerous sexual offender from "the dangerous but typical recidivist convicted in an ordinary criminal case."

Id. at 278.

This interpretation of "likely" obscures the distinction which Crane said is so critical. As the court explained in Crane the "line between an irresistible impulse and and impulse not resisted is probably no sharper than that between twilight and dusk." Crane, at 412. The critical distinction here is a "special and serious lack of ability to control behavior." Id. at 412-413. To be commitable the defendant must have a mental abnormaility or personality disorder that "makes it difficult, if not impossible, for the dangerous person to control his dangerous behavior." Id. at 411. There is no question that a high proportion of dangerous criminal who complete sentences for violent none sex crimes, either do not, or cannot resist the impulse to reoffend; and many of them—40% to 60%—suffer from antisocial personality disorder, the same mental abnormality that was used as a basis for seeking the commitment of Michael

T. Crane in <u>Kansas v. Crane</u>. Id. at 411. Without a definition of "likely" which emphasizes the special and serious lack of ability to control behavior, there is no guarantee that the jury has made the kind of analysis that is necessary to distinguish the defendant from the "typical" recidivst" who as often as not reoffends. Introducing additional factors, such as the seriousness of the threatened harm only clouds this distinction and invites the jury to base its decision on the stregnth of its predjudice or revulsion to the particular crime that the defendant previously committed.

3.  THE PETITIONER'S INABILITY TO
    EFFECTIVE REPRESENT HIMSELF

As can be seen from the foregoing outline of the grounds for the petition, the legal arguments are complicated and subtle. The petitioner dropped out school in the tenth grade at Leominster Trade High School. (See the petitioner's attached affidavit.) Although the petitioner has subsequently obtained his G.E.D., while incarcerated, and has taken a few college courses from Mount Wachusetts Community College, the petitioner does not have the kind of training or experience to adequately present the legal arguments in this case. In order to file this petition and motion the petitioner had to obtain the assistance of another inmate, who has done all of the work. The assistance of another inmate is clearly no substitute for the advocacy of an experienced attorney.

The petitioner, therefore, respectfully requests that the court appoint counsel to represent him in this petition for the issuance of a writ of habeas corpus.

10

Respectfully submitted,

Edward A. Given, Petitioner,

*Edward A. Given*
Edward A. Given, Pro Se
Mass. Treatment Center
30 Administration Rd.
Bridgewater, MA 02324

August 3, 2005