UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| EDWARD A. GIVEN ) | |
| Petitioner, ) | |
| ) | CIVIL ACTION |
| v. ) | NO. 05-11663-NMG |
| ) | |
| ROBERT MURPHY, ) | |
| Respondent ) | |
| _____ ) | |

RESPONSE TO COMMONWEALTH'S REPLY MEMORANDUM
REGARDING MOTION TO DISMISS

Petitioner Edward A. Given responds as follows to Respondent Robert Murphy's

Reply Memorandum in Support if Motion to Dismiss, in accordance with this Court's

order dated February 22, 2006.

1.    The Commonwealth attempts to create a distinction with no basis in
        Massachusetts law.

In his Response to the Commonwealth's motion to dismiss, Given pointed out

that the Supreme Judicial Court entertained a _habeas corpus_ petition challenging the

petitioner's original commitment in Dutil, petitioner, 437 Mass. 9 (2002), even after the

petitioner had lost a subsequent G.L. c. 123A § 9 trial. He argued that any such petition

would have necessarily have been dismissed as moot unless it provided a means for

immediate release from confinement. _See_ Petitioner's Response at 3, citing Sheriff of

Suffolk County v. Pires, 438 Mass. 96, 100 (2002).  He similarly noted that under the

Commonwealth's reasoning, there would have been no basis for the SJC to strike the

petitioner's commitment in Redgate, petitioner, 417 Mass. 799 (1994), following the

reaffirmation of his commitment in a subsequent § 9 hearing. Response at 2.

The Commonwealth now attempts to distinguish the case at hand from <u>Dutil</u> and <u>Redgate</u> on the grounds that those two cases involved the individuals' eligibility for civil confinement rather than mere trial errors. The former, it apparently claims, merit review of commitments even after subsequent § 9 trials; the later do not. Support of Motion to Dismiss at 10-11, n. 6. The Commonwealth cites no such distinction in Massachusetts law. None exists.

The SJC might easily have declared that either <u>Dutil</u> or <u>Redgate</u> represented an exception to the usual rules against challenging initial commitments in G.L. c. 123A § 9 proceedings due to the nature of the petitioner's claim. It did not.

The Commonwealth cites the SJC's statement in <u>Dutil</u> that the same results would have obtained whether Dutil had challenged his original commitment or the trial court's refusal to release him in 1996. It does not explain how this proves or tends to prove that the verdict in the later proceeding constituted a new commitment rather than a confirmation of the continuing validity of the old one.

The Commonwealth cites <u>McHoul, petitioner</u>, 445 Mass. 143, 158 (2005), where the Court rejected the petitioner's challenges to the predicate for his initial commitment, noting that "The sole issue at the § 9 hearing is whether the petitioner, having previously been committed, remains sexually dangerous." Reply Memorandum at 3. But McHoul's challenges to the predicate for such original commitment included the following :

- "The Commonwealth [was] estopped from arguing that McHoul's prior crimes were the product of an inability to control his sexual impulses where the Commonwealth previously argued and the courts found that he did not suffer from an 'irresistible impulse' the time he committed them." (<u>McHoul</u> brief (Appendix A) at 18-21);

- "A diagnosis of antisocial personality disorder is insufficient grounds for commitment (<u>McHoul</u> br. at 31-37);

- The Equal Protection Clause forbids commitment of a schizophrenic under G.L. c. 123A rather than G.L. c. 123 (McHoul br. at 38-41).

If, as the Commonwealth claims, the Supreme Judicial Court distinguishes between cases challenging the petitioner's eligibility for commitment and those challenging mere trial errors, then surely it would not have dismissed these challenges to the constitutional bases for McHoul's commitment. The Commonwealth's suggested two-tiered system for reviewing allegedly expired commitments makes no sense in light of the very precedents it cites in support thereof.[1]

There is even less basis for the Commonwealth's reliance on Davis v. Commonwealth, 62 Mass.App. Ct. 1104 (2004) (attached as Appendix B). Not only is the case unpublished and therefore entirely lacking in precedential value;[2] the Commonwealth's citation is limited to a footnote which would not support its claim even if it were properly cited as precedent. As the Commonwealth states, the Court noted that "[a]rguably, the case is moot, given that the remedy the petitioner seeks -- a new trial... --

---

[1] The Supreme Judicial Court's real reason for refusing to hear McHoul's attacks on his eligibility for commitment seems to be found in the following sentence: "The petitioner could have, and did, appeal from his original commitment." 445 Mass. at 158. In other words, the issue is one of timely appeal and expedited proceedings rather than expiration of the original commitment. *See also* Davis, petitioner, 383 Mass. 645, 650 ("More appropriate avenues exist which may be used to challenge the underlying commitment proceedings. See, e.g., G. L. c. 248.").

[2] *See* Purvis v. Commissioner of Correction, 29 Mass.App.Ct. 190, 192, n.5 (1990)(" The defendants also cite in support of this concept a decision issued pursuant to Rule 1:28 of this court. ...[W]e note that unpublished decisions of this court are not to be relied upon or cited as authority in unrelated cases. Lyons v. Labor Relations Commn., 19 Mass. App. Ct. 562, 566 & n.7 (1985), S.C., 397 Mass. 498 (1986). Wolbach v. Beckett, 20 Mass. App. Ct. 302, 306 n.5 (1985).").

is already available to him" in the form of "a yearly examination of dangerousness."[3]
That which is arguable is not decided.

But not only is the issue left undecided; it's the wrong issue. The footnote
concerns the appealability of a § 9 verdict finding the petitioner still sexually dangerous.
The Court found the following suggestion arguable:  that a new § 9 petition might have
provided the exact same new § 9 trial that the petitioner sought in challenging the court's
rulings in his previous§ 9 trial.  It has no bearing here, where Given, again, challenges the
initial commitment finding him sexually dangerous.[4]  A new trial would, again, require
the Commonwealth to prove that he is *still* sexually dangerous, whereas he maintains the
right to a fair determination of whether he was ever an SDP at all.

The Commonwealth relies on inconclusive, irrelevant *dicta* contained in a
footnote in an unpublished case.  It is not persuasive.

    2.    <u>The Commonwealth improperly and unconvincingly speculates as to
Given's Motives.</u>

---

[3]Even this "arguable" claim is incorrect as a matter of Massachusetts law. As the SJC
explained in <u>Trimmer, petitioner</u>, 375 Mass. 588, 590 (1978):

> While [G.L.c. 123A] § 9 requires that a speedy hearing be held, it clearly does not
> set an express time limitation within which the court must hold a reexamination
> hearing. . . . The one-year period, rather than serving as an automatic criterion of
> whether a speedy hearing was provided, fixes a limitation on the number of
> hearings which an SDP may request.

In <u>Lund, petitioner</u>, 35 Mass.App. Ct. 908, 908-09 (1993), the Appeals Court, relying on
<u>Trimmer</u>, found no error even where a resident was denied a new trial until two and a half
years after he filed his petition.

[4] If, as the Commonwealth suggests, this unpublished footnote established that initial
trials were not appealable, Given's own case would never have made its way from the
Appeals Court to the Supreme Judicial Court. *See also* <u>Commonwealth v. Markvart</u>, 771
N.E.2d 778 (Mass. 2002); and <u>Commonwealth v. Poissant</u>, 443 Mass. 558 (2005), among
many other appellate decisions discussing the proper conduct of G.L. c. 123A initial
trials.

The Commonwealth notes that Given and the Commonwealth agreed to postpone his § 9 trial pending the Supreme Judicial Court's review of the Appeals Court decision reversing his commitment. Reply Memo at 4-5. "The only conceivable reason Given would have for postponing the trial is the knowledge that, if he was re-adjudicated as an SDP, it would moot the appeal of his initial commitment, and he would remain committed," the Commonwealth contends.

The Commonwealth ignores other reasons why Given would agree to postpone his trial:

- Having won his case in the Appeals Court, Given had little incentive to subject himself to review of a reversed commitment.

- Any G.L. c. 123A trial involves an enormous amount of work, uncertainty, and anxiety[5] which might well be avoided if, as Given expected, he prevailed on appeal;

- The issue at a § 9 trial is whether the petitioner *remains* sexually dangerous, McHoul, *supra,* whereas the issue at an initial commitment trial under § 14 is whether the individual is sexually dangerous in the first place. The two kinds of trials thus require different strategies on the part of the individual, even while the burden on the Commonwealth remains the same. Thus, any testimony Given presented at his § 9 to show how he was no longer sexually dangerous could be used against him in a subsequent retrial of his initial commitment as an admission of previous sexual dangerousness, in the event he lost the § 9 hearing and won the appeal.

- Given's counsel might well have considered the possibility that losing his intervening § 9 trial would negatively impact his chances at the Supreme Judicial Court, despite the best efforts of the justices to pay it no mind.

- While Given had no reason to believe that re-adjudication would moot his initial commitment, he had every reason to believe that the Commonwealth would make such an argument, much as it has done here. His counsel, like any reasonably cautious attorney, could have taken nothing for granted.

---

[5] *See* Green v. United States, 355 U.S. 184, 187 (1957); Abney v. United States, 431 U.S. 651, 661-62 (1977).

These reasons for Given's agreement to postpone trial may seem obvious. They are easily ignored, however, when one party, in its own interests, speculates about the reasons for its opponent's tactical decisions.

> 3.    The Commonwealth's contentions regarding Article III and *Huftile v. Miccio-Fonseca* are unsustainable.

The Commonwealth states that "[i]n his opposition, Given fails to provide any compelling argument to support the notion that he has Article III standing." Reply Memo at 5. To the contrary, Given clearly set forth a compelling argument in his Response to the Commonwealth's Motion to Dismiss:

- that he remains incarcerated pursuant to his original commitment under the clear, unambiguous language of the Statute and supporting caselaw. His intervening § 9 trial determined only whether he should be released from it. Response at 1-5;

- that even if the § 9 trial somehow eliminated his "day to life" commitment and replaced it with another one lasting only until his next § 9 hearing, the new commitment is "fairly traceable" to the old in that he would not have been subject to the § 9 trial establishing such new commitment had he not first been committed at the initial SDP trial, the basis for his petition herein. Response at 6-8.

Indeed, the Commonwealth makes no attempt to refute this latter point. Instead, it argues that "Given relies almost exclusively on Huftile v. Miccio-Fonseca, 410 F.3d 1136 (9th Cir. 2005)." Reply Memo at 5. The Commonwealth apparently forgets that Given cited Huftile only in response to its own inaccurate description of Jackson v. California Dep't of Mental Health, 399 F.3d 1069 (9th Cir. 2005).

The Commonwealth tries to distinguish Huftile by arguing that "[u]nder the [California] SVPA, an initial commitment serves as a prerequisite for a petition for recommitment (termed 'extended commitment') under the statute." Reply Memo at 6. It does not explain why an initial commitment serves as any less of a prerequisite for a petition for release under G.L. c. 123A § 9.

<u>Conclusion</u>

The Commonwealth's Motion to Dismiss remains meritless. It should be dismissed and the merits of Given's petition addressed without further delay.

Respectfully submitted,

_____

DAVID HIRSCH
BBO #600915
COMMITTEE FOR PUBLIC
COUNSEL SERVICES
44 Bromfield St.
Boston, Massachusetts 02108
(617) 482-6212


**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that a true copy was mailed, postage paid, to the attorney for respondent:

Scott A. Katz
Assistant Attorney General
Criminal Bureau
One Ashburton Pl.
Boston MA 02108

this 28th day of February, 2006.

_____

David Hirsch

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK COUNTY

SUPREME JUDICIAL COURT
NO. 09392

---

JAMES McHOUL,
Petitioner/Appellant

v.

COMMONWEALTH,
Respondent/Appellee

---

ON APPEAL FROM JUDGMENT OF
THE SUFFOLK SUPERIOR COURT

---

BRIEF OF MR. McHOUL

---

David Hirsch
BBO No. 600915
Committee for Public Counsel Services
44 Bromfield St.
Boston MA 02108
(617) 988-8453

**TABLE OF CONTENTS**

Issues Presented...........................................1

Statement of the Case......................................3

Statement of Facts.........................................3

    1.   Background......................................3

    2.   The Trial......................................4

Argument...................................................8

    1.   The trial court committed reversible error by instructing the jurors that "compulsive" and "impulsive" acts were one and the same........8

        (a)  "Compulsive" and "impulsive" behavior are not synonymous.......................8

        (b)  Mere impulsivity is insufficient to establish a "serious inability to control one's conduct" as required by <u>Kansas v. Crane</u>.........................9

        (c)  The trial court severely prejudiced Mr. McCoul by confusing impulsivity with compulsivity...............................11

        (d)  By confusing impulsivity with compulsivity, the trial court rendered meaningless the requirement that the jurors find Mr. McHoul's crimes "repetitive or compulsive" in order to commit...................................13

    2.   The trial court committed reversible error by failing to instruct the jury that commitment required a finding of mental abnormality or personality disorder........................13

    3.   The trial court provided the jury with an overbroad definition of continued sexual dangerousness...............................17

    4.   The Commonwealth is estopped from arguing that Mr. McHoul's committed his prior offenses due to an inability to control his sexual impulses where the Commonwealth previously argued and the courts found that he did not suffer from an "irresistible impulse" at the times he committed them.......................18

    5.   The trial court committed reversible error

by admitting "totem pole hearsay.".............21

    (a)   As a matter of due process, <u>Commonwealth</u> <u>v. Markvart</u> specifically excludes from evidence hearsay allegations of crimes which did not result in convictions.......26

    (b)   <u>Boyer</u> and <u>Markvart</u> exclude the use of multiple hearsay allegations within otherwise admissible reports for any and all purposes................................28

  6.   There was insufficient evidence to commit in that the experts failed to diagnose Mr. McHoul with a "mental abnormality or personality disorder" that might justify commitment...................................29

  7.   A diagnosis of antisocial personality disorder is insufficient grounds for commitment...................................31

  8.   The Equal Protection Clause forbids commitment of a schizophrenic under G.L. c. 123A rather than G.L. c. 123.............................38

  9.   The trial court erred by failing to require a unanimous verdict.............................41

 10.   The question of whether McHoul "remained" an SDP was improper in that his initial commitment was purposeless under <u>Commonwealth</u> <u>v. Shedlock</u> and thus unconstitutional..........42

Conclusion.............................................44

**TABLE OF AUTHORITIES**

**CASES**

Andrews, petitioner, 368 Mass. 468 (1975)..................39

Commonwealth v. Beausoleil, 397 Mass. 206 (1986).........10

Commonwealth v. Boyer, 58 Mass.App.Ct. 662 (1993)..........................................22-24, 27-29

Commonwealth v. Bruno, 432 Mass. 489 (2000).......21, 42, 44

Commonwealth v. Davis 407 Mass. 47 (1990)................40

Commonwealth v. DeSalvo, 353 Mass. 476 (1968)............18

Commonwealth v. Given, 441 Mass. 741 (2004).............26

Commonwealth v. Markvart, 437 Mass. 331 (2002)..................................2, 22, 24, 26-29

Commonwealth v. McHoul ("McHoul I"), 352 Mass. 544 (1967)....................................9, 18-20

Commonwealth v. McHoul ("McHoul II"), 372 Mass. 11 (1977)...............................................17

Commonwealth v. McCann, 325 Mass. 510 (1950).............20

Commonwealth v. Reese, 438 Mass. 519 (2003).............31

Commonwealth v. Rogers, 7 Met. 500......................9

Commonwealth v. Shedlock, 58 Mass.Ct.App. 445 (2003)...............................................42-44

Commonwealth v. Tate, 424 Mass. 236 (1998)..............44

Commonwealth v. Torres, 437 Mass. 460 (2002)............31

Commonwealth v. Vao Sok, 425 Mass. 787 (1997)...........10

Cummings v. Missouri, 71 U.S. 277 (1867).................36

Davis, petitioner, 383 Mass. 645 (1981)..................19

Dep't of Youth Services v. a Juvenile, 398 Mass. 516 (1986) ("DYS").....................21-22, 28-29

Dutil, petitioner 437 Mass. 9

(2002)...........................10-11, 14-17, 31, 40-41, 43

Foucha v. Louisiana, 504 U.S. 71 (1992).......14, 32, 34, 36

Hubbart v. Superior Court, 969 P.2d 584
(Cal. 1999)...........................................34

Humphrey v. Cady, 405 U.S. 504 (1972)..................38-39

Jackson v. Indiana, 406 U.S. 715 (1972).........38-39, 41-42

Kansas v. Crane, 534 U.S. 407
(1997)..........................9-11, 16-18, 21, 31, 33, 37

Kansas v. Hendricks, 521 U.S.
346 (1997)...................14, 17, 119, 31-32, 34-35, 37

McHoul v. Commonwealth, 10 Mass. App.
Ct. 878 (1980)("McHoul III").........................19-20

Newton, petitioner, 357 Mass. 346 (1970)..................38

Sheridan, petitioner, 422 Mass. 776 (1996)...............41

U.S. Term Limits, Inc. v. Thornton,
514 U.S. 779 (1995)......................................36

## STATUTES & CONSTITUTIONAL PROVISIONS

G. L. c. 123...............................................2, 38-40

G.L. c. 123 §4.................................................40

G.L. c. 123 §8(d)..........................................39-40

G.L. c. 123A..........................................*passim*

G.L. c. 123A §1.......................8, 13, 15-16, 21, 43

G.L.c 123A §5 (repealed)...............................41

G.L. c. 123A §9..........................................3, 20, 43

G.L. c. 123A §12-14.........................................43

G.L. c. 123A §14(d)........................................39, 41

United States Constitution, 14th Amendment...2, 26-27, 38-42

## OTHER AUTHORITIES

American Psychiatric Association, *amicus* brief,
Barefoot v. Estelle, 463 U.S. 880 (1983)..................33

Association for the Treatment of Sexual Abusers,
*amicus* brief, Kansas v. Hendricks, 521 U.S. 346 (1997)....34

Becker and Murphy, "What we Know and Do Not Know
about Assessing & Treating Sex Offenders," 4 J.
Psychol., Public Policy, & the Law 116 (1998).........33-34

Cornwell, "Understanding the Role of the Police
and Parens Patriae Powers in Involuntary Civil
Commitment before and after Hendricks," 4
Psychology, Public Policy, and Law 377 (1998).........32-33

Gottfredson and Hirschi, A General Theory of Crime,
Stanford U. Press (1990)..............................10-11

Hanson, "Recidivism and Age," 17 J. of
Interpersonal Violence 1046 (2002)......................10

Hanson & Bussiere, "Predicting Relapse: A meta-
Analysis of Sexual Offender Recidivism Studies,"
66 J. Consulting & Clinical Psychology.............6, 27-28

Hanson & Morton-Bourgon, "Predictors of Sexual
Recidivism: An Updated Meta-Analysis," Dept. of
Public Safety and Emergency Preparedness Canada
(2000)................................................36-37

Janus, "Foreshadowing the Future of Kansas
v. Hendricks: Lessons from Minnesota's Sex
Offender Commitment Litigation," 92 Nw.U.L.Rev.
1279 (1998).............................................32

Monahan, The Clinical Prediction of Violent Behavior,
U.S. Dept. of H.H.S. Public Health Service (1981)......35-36

Moran, "The Epidemiology of Antisocial Personality Disorder,
34 Social Psychiatry & Psychiatric
Epidemiology 231 (1999)...............................31-33

Morse, "Blame and Danger: An Essay on Preventive Detention,"
76 B.U. L. Rev. 113, 126 (1996).............33

New Oxford American Dictionary (2001).....................8

Steiker, "Forward: The Limits of the Preventative
State," 88 J. Crim. L. & Criminology 771 (1998).........35

Wettstein, "A Psychiatric Perspective on Washington's
Sexually Violent Predators Statute," 15 U. Puget Sound L.
Rev. 597 (1992)........................................35

## Cases

<u>Addington v. Texas</u>, 441 U.S. 418 (1979)…………………………………...10-11

<u>Berger v. United States</u>, 295 U.S. 78 (l935)……………………………………..14

<u>Boren v. Sable</u>, 887 F.2d 1032, 1036-37 (10th Cir. 1989)………………….17-18

<u>California v. Green</u>, 399 U.S. 149 (1970)………………………………………...7

<u>Carty v. Nelson</u>, 431 F.3d 1185 (9th Cir. 2005)…………………………...11, 16

<u>Commonwealth v. Boyer</u>, 792 N.E.2d 677 (Mass.App. 2003)……………...1-2, 4

<u>Commonwealth v. Durling</u>, 551 N.E.2d 1193 (Mass. 1990)……...……………...4

<u>Commonwealth v. Given</u>, 808 N.E.2d 788 (Mass. 2004)….……………………...4

<u>Commonwealth v. Markvart</u>, 771 N.E.2d 778 (Mass. 2002)………………...11-12

<u>Commonwealth v. McDonough</u>, 511 N.E.2d 551 (Mass. 1987)……………….2-4

<u>Commonwealth v. McHoul</u>,  833 N.E.2d 1146 (Mass. 2005)……………..*passim*

<u>Commonwealth v. McGruder</u>, 205 N.E.2d 726 (Mass. 1965)……………….....16

<u>Commonwealth v. Morales</u>, 805 N.E.2d 1007 (Mass.App. 2004)…...…………...2

<u>Commonwealth v. Thomas</u>, 439 Mass. 362, 372 (2003)…………………………...4

<u>Crawford v. Washington</u>, 541 U.S. 36 (2004)………………………………...5, 7, 9

<u>Dutton v. Evans</u>, 400 U.S. 74 (1970)……………………………………….......6-7

<u>Ezeagwuna v. Ashcroft</u>, 325 F.3d 396 (3d Cir. 2003)……………………...7, 13, 17

<u>Gagnon v. Scarpelli</u>, 411 U.S. 778 (1973)……………………………………...4

<u>Green v. Georgia</u>, 442 U.S. 95 (1979)………………………………………...15

<u>Idaho v. Wright</u>, 497 U.S. 805 (1990)………………………………………...7-8

<u>In re G.G.N.</u>, 855 A.2d 569 (N.J.Super. 2004)……………………………………...12

<u>In re Registrant C.A.</u>, 679 A.2d 1153 (N.J. 1996)…………………………………9

<u>Jenkins v. State</u>, 803 So. 2d 783 (Fla.App. 2001)……………………….11, 14, 17

<u>Lee v. State</u>, 854 So.2d 709 (Fla.App. 2003),
<i>rev. den</i>. 908 So. 2d 1057 (Fla. 2005)……………………………………...16

<u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977)……………………………………..8

<u>Marshall v. Lonberger</u>, 459 U.S. 422, 438 (1983)…………………………….…9

<u>Mathews v. Eldridge</u>, 424 U.S. 319 (1976)……………………………….12, 18

<u>Mattox v. United States</u>, 156 U.S. 237 (1983)……………………………….…7

<u>Montana v. Egelhoff</u>, 518 U.S. 37 (1996)……………………………………….9

<u>Morrissey v. Brewer</u>, 408 U.S. 471……………………………………….....12

<u>Ohio v.Roberts</u>, 448 U.S. 56 (1980)……………………………………………7

<u>Parker v. Commonwealth</u>, 587 S.E.2d 749 (Va.App. 2003)…………………....8

<u>People v. Carter</u>, 117 P.3d 476 (Cal. 2005)…………………………………….8

<u>People v. Otto</u>, 26 P.3d 1061 (2001)………………………………….10-13, 16

<u>Pointer v. Texas</u>, 380 U.S. 400 (1965)………………………………………….6

<u>Santosky v. Kramer</u>, 455 U.S. 755 (1982)…………………………………….13

<u>Sira v. Morton</u>, 380 F.3d 57 (2d Cir. 2004)……………………………6, 9, 15, 17

<u>Specht v. Patterson</u>, 386 U.S. 605 (1967)………………………………………4

<u>State v. Ryan</u>, 691 P.2d 197 (Wash. 1984)………………………………………8

<u>United States v. Abuhamra</u>, 389 F.3d 309 (1st. Cir. 2001)…………………….9

<u>United States v. Aspinall</u>, 389 F.3d 332 (2d Cir. 2004)…………………….....8-9

<u>United States v. Baker</u>, __ F.3d __, 2005 U.S. App. LEXIS 27159
(11th Cir., Dec. 13 2005)……………………………………………………...7

<u>United States v. Cuong Gia Le</u>, 327 F. Supp. 2d 601 (E.D. Va. 2004)…………15

United States v. Egge, 223 F.3d 1128, 1132 (9th Cir. 2000)..........................8

United States v. Emanuele, 51 F.3d 1123 (3d Cir. 1995)............................8

United States v. Fell, 360 F.3d 135 (2d Cir. 2004)...................................14

United States v. Franklin, 415 F.3d 537 (6th Cir. 2005).............................7

United States v. Haynes, 269 F. Supp. 2d 970 (W.D. Tenn. 2003).................15

United States v. Johnson, 378 F. Supp. 2d 1051 (N.D. Iowa, 2005)...............15

United States v. Jordan, 357 F. Supp. 2d 889 (E.D. Va. 2005).....................15

United States v. Matthews, 246 F. Supp. 2d 137 (N.D. NY 2002)...............8, 15

United States v. Polson. 285 F.3d 563 (7th Cit. 2002).............................11

United States v. Saget,  377 F.3d 223 (2d Cir. 2004).................................7

United States v. Thomas, 280 F.3d 1149 (7th Cir. 2002).............................8

United States v. Wise, 976 F.2d 393 (8th Cir. 1992)..............................6

Vitek v. Jones, 445 U.S. 480 (1980)....................................................13

White v. Illinois, 502 U.S. 346 (1992)................................................5-8

Whitnell v. State, 129 S.W.3d 409 (Mo.App. 2004)................................16

Zanazanian v. United States, 729 F.2d 624 (9th Cir. 1984).......................18


**Statutes and Constitutional Authorities**

Cal. Welf. & Inst. Code § 6604......................................................13

Mass. General Laws ch. 123A §5.......................................................1

Mass. General Laws ch. 123A §6.......................................................1

Mass. General Laws ch. 123A §6A......................................................2

Mass. General Laws ch. 123A § 9................................................. 1-2, 4

Mass. General Laws. ch. 123A §12..................................................1

Mass. General Laws. ch. 123A §14(b)..................................................13

Mass. General Laws. ch. 123A §14(c).............................................. 1-2, 11

Mass. General Laws. ch. 123A §14(d)................................................11. 13

United States Constitution, 6th Amendment
(Confrontation Clause)..................................................5-8

United States Constitution, 14th Amendment
(Due Process Clause)..................................................*passim*

## Other Authorities

4 Weinstein & Berger, Weinstein's Evidence P805 [01]..........................18

## ISSUES PRESENTED

1.   Whether the trial court erred by defining "impulsivity" as the same as "compulsivity."

2.   Whether impulsivity as opposed to compulsivity is a constitutionally valid basis for commitment.

3.   Whether the trial court's equation of impulsivity and compulsivity prejudiced McHoul's right to a fair trial where the expert witnesses described him as compulsive but able to control himself.

4.   Whether the trial court's incorrect definition of compulsivity rendered meaningless the requirement of proof of "compulsive or repetitive sexual misconduct."

5.   Whether a jury in a "sexually dangerous person" review hearing must be instructed that commitment requires proof of current mental abnormality or personality disorder.

6.   Whether the trial court improperly defined "sexually dangerous person" by instructing the jury to determine whether "the plaintiff continues to suffer from the psychological forces, conditions, problems, or other root causes that led him to commit these earlier acts of sexual misconduct."

7.   Whether Commonwealth is estopped from arguing that McHoul's committed his prior offenses due to an inability to control his sexual impulses where the Commonwealth previously argued and the courts found

that he did not suffer from an "irresistible impulse" at the times he committed them.

8.    Whether statements included in treatment records and other documents, including admissions by the individual, must be excluded from evidence as "totem pole hearsay" unless a witness to those statements testifies to them in court.

9.    Whether Commonwealth v. Markvart, 437 Mass. 331 (2002), requires exclusion from evidence of allegations of prior crimes for which the individual was not convicted.

10.    Whether the Commonwealth may elicit otherwise inadmissible hearsay in its case in chief in order to explain the bases for its experts' opinions.

11.    Whether commitment is permissible in the absence of a specific diagnosis explaining the individual's alleged inability to control his sexual impulses.

12.    Whether "anti-social personality" is constitutionally sufficient grounds for commitment.

13.    Whether the Equal Protection clause forbids the Commonwealth from petitioning a schizophrenic for indefinite commitment under G.L. c. 123A rather than the shorter period of commitment specified under G.L. c. 123.

14.    Whether statutory construction, equal protection, and due process require that a verdict in favor of

continued commitment under G.L. c. 123A §9 be unanimous.

## STATEMENT OF THE CASE

Appellant/respondent Daniel McHoul was committed to the Massachusetts Treatment Center ("MTC") as a sexually dangerous person in 1974.  He had previously begun serving a twenty-five to thirty year prison sentence for a 1967 assault with intent to rape conviction.  TR I[1] 83, 109, 110.

This matter was tried to a jury before the Hon. Sandra Hamlin beginning March 5, 2003, on Mr. McHoul's petition for discharge under G.L. c. 123A §9.

At the conclusion of the case, the jury found by a vote of at least eleven to two that Mr. McHoul remained sexually dangerous.

## STATEMENT OF FACTS

1.  <u>Background</u>

McHoul is a sixty-one year old man who has been in custody for almost forty years, the past thirty of those years in treatment at the MTC. TR II 66. He was convicted of sexual offenses when he was in his early and mid twenties. TR I 128.  In 1964, he was convicted of Assault with intent to Rape and two counts of Breaking and Entering in the Daytime with Intent to Rape, for crimes occurring in 1962. In 1967, while on

---

[1] "TR" stands for the transcript of proceedings, followed by roman and Arabic numerals indicating volume

probation, he was committed of Assault with Intent to Rape, and Breaking and Entering a Dwelling with Intent to Rape and Putting in Fear.

While he is alleged to have spoken inappropriately to or about women at MTC, TR I 124-26, 146-149, 182, TR 3.6 11-22, 32-34, 63-64, TR III 52-53, 96, and to have had inappropriate sexual fantasies about female staff members, TR I at 125, he has never threatened or assaulted female staff during his nearly thirty years at MTC. TR I 182-83; III 76-77.[2] He did not engage in physical altercations with other residents or staff during the six years prior to trial. TR I 183; III 79-80. He has always participated in treatment (TR I 148), with attendance at primary group nearly one hundred percent in recent years. TR I 191-92; III 73.

2. The Trial

Drs. Frederick Kelso and Mark Schaefer, both "qualified examiners", and Dr. Margery Gans, a member of the Community Access Board ("CAB"), testified for the Commonwealth. McHoul did not present evidence.

Dr. Gans reported that McHoul refused to answer questions at his annual treatment review held on January 7, 2003, before a CAB panel. TR I 97. She testified that she wrote the review report based on

---

and page. References to the record appendix are designated as "RA", followed by the page number.
[2] He is alleged to have once touched a nurse on the arm in 1990. RA 105.

4

information from treatment team members who attended the his annual review, id. at 98, and by reviewing previous treatment center reports and records. Id. at 187-88.

Gans testified that McHoul had made some treatment progress during his commitment. TR II 11. She said that between 1999 and 2001, when McHoul was placed in a "pro-social group" for men needing extra support to understand principles of treatment program, he learned to settle down and to benefit from the structure that was applied. TR I 145-46. *See also* Kelso report, RA 124. She testified that he was removed from that group for approaching and talking to the group leader in "inappropriate ways," such as asking about her personal life. *Id.* at 146-47.

She said McHoul is "definitely good in treatment," but tends to cross boundaries in dealing with female staff in both sexual and non-sexual ways. Id. at 148-49. She said he made progress, especially when he was on medications. *Id.* at 158. She believed he had been taken off the medications due to side effects, and that that would have been a good reason to investigate other possible medications. *Id.* at 188-89. She did not know whether other medications had been recommended. TR II 10. In cross-examination, she admitted: "I said he's made some progress, and it's hard to judge how consistent it is." *Id.* at 11.

Gans acknowledged that as Mr. McHoul aged, "[s]tatistically, as part of a group, his likelihood of recidivating is smaller." *Id.* at 190. She seemed to agree on cross examination that according to Hanson and Bussiere's meta-analysis, the correlation between past rape and future sexual crime is low. *Id.* at 191.

Dr. Schaefer stated that although Mr. McHoul had spoken to him for over an hour, his evaluation was largely based on past police reports, yearly treatment reviews, and treatment notes. TR II 50-51. He added: "And there are old records. Although again, in Mr. McHoul's case, this is a little difficult because the actual criminal offenses now occurred almost forty years ago." *Id.* at 51.

Schaeffer found significance in Mr. McHoul having been disciplined for consensual sex with another resident, "because it's a sexual offense." *Id.* at 65.

All three experts testified that McHoul had made some women at MTC uncomfortable by staring at them, particularly at their breasts, TR I 32; II 64-65; III 65. Gans said that "[b]etween 1998 and now, particularly in the late '90s before he was in the pro-social group, he would admit to having rape fantasies" and to masturbating to those fantasies. Id. at 156. She stated that some women at the Center "felt intimated by him, were made nervous by him, were

frightened by him." *Id.* at 157.  She described these women as "in a sense...victims," *id.*

Dr. Kelso testified about a note McHoul had written about a female therapist indicating he had missed her, TR III 52.  All three noted that according to records, McHoul had fallen in love with another therapist and hoped to marry her. TR I 33-34; II 78; III 40-44.

Mr. McHoul moved to exclude reference to alleged crimes of which he had not been convicted. TR I 51-57, 112. The motion was denied. *Id.* at 67-68, 112. He objected to the introduction of treatment notes and annual treatment reports from MTC. *Id.* at 114-117, TR III 54. The objections were overruled. *Id.* at 54,    He objected to reference to his alleged admissions in treatment to other crimes, and to his feelings about the alleged victims. Again, the motions were denied. *Id.* at 118-121. He objected to third-person hearsay accounts of things he had allegedly said or done at the Treatment Center. The objections were denied. *Id.* 123-26.

McHoul further objected to the admission of "Observation of Behavior Reports" – essentially, disciplinary reports – from the Treatment Center. TR II 34-35, 83-84, 87. The objection was denied. TR III 100.

Additional facts regarding the material introduced over objection appear in the "argument" section of this brief.

## ARGUMENT

1. <u>The trial court committed reversible error by instructing the jurors that "compulsive" and "impulsive" acts were one and the same.</u>

(a) *"Compulsive"* and *"impulsive"* behavior are not synonymous.

G.L. c. 123A §1 defines a sexually dangerous person as, *inter alia*, one "whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive sexual misconduct by either violence against any victim, or aggression against any victim under the age of 16 years...."

Over objection, TR III 104, 113, the trial court instructed the jurors that "An act of sexual misconduct may be compulsive if the act is impulsive *or* is committed because the actor lacks the power to control his sexual impulses." *Id.* at 164. This was clear error and denied Mr. McHoul a fair trial.

The New Oxford American Dictionary (2001) defines "impulsive" in pertinent part as "acting or done without forethought;" and "compulsive," also in pertinent part, as "resulting from or relating to an irresistible urge, esp. one that is against one's conscious wishes: *compulsive eating.*"

8

The key difference between these two definitions lies in the phrase "irresistible urge." Everyone acts impulsively, when we stop in an interesting shop on the way home, or when we go to the supermarket intending to buy vegetables but walk out with cookies as well. While these acts are clearly impulsive, they are compulsive only for those of us who are driven to follow their impulses; who are unable to resist the impulse to go into the shop or buy the cookies.[3]

By confusing the two terms, the trial court rendered the statutory requirements meaningless.

> (b) *Mere impulsivity is insufficient to establish a "serious inability to control one's conduct" as required by* <u>Kansas v. Crane</u>.

Sexually Dangerous Persons' commitment requires "proof of serious difficulty in controlling behavior." <u>Dutil, petitioner</u> 437 Mass. 9, 13 (2002); <u>Kansas v. Crane</u>, 534 U.S. 407, 413 (1997). <u>Crane</u> demands that

---

[3] The SJC apparently adopted this distinction in <u>Commonwealth v. McHoul (McHoul I)</u>, 352 Mass. 544, 553 (1967), Mr. McHoul's appeal of his 1966 conviction. Citing Chief Justice Shaw's definition of insanity in <u>Commonwealth v. Rogers</u>, 7 Met. 500, 501-502, the Court explained:

> Although the issue has been, as Chief Justice Shaw in substance stated, whether the defendant was irresistibly impelled to the act done, the emphasis, in modern times, has inevitably been on the concept expressed in the word "irresistible." ... Although the mind may have a part in planning and executing compulsive acts, that circumstance does not prevent the finding of "irresistible impulse."

sexually dangerous persons be distinguishable "from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." 534 U.S. at 412.

By definition, every criminal has been either unwilling or unable to control his/her impulses. As Dr. R. Karl Hanson[4] points out:

> The association between low self-control and criminal behavior is sufficiently strong that Gottfredson and Hirschi (1990) considered it to be the cause of crime.

Hanson, "Recidivism and Age," 17 J. of Interpersonal Violence 1046, 1057 (2002).[5]  Gottfredson and Hirschi explain:

> People who lack self-control will tend to be impulsive, insensitive, physical (as opposed to mental), risk-taking, short-sighted, and nonverbal, and they will tend therefore to engage in criminal analogous acts.

A General Theory of Crime, Stanford U. Press (1990).

If general poor self-control constitutes the "proof of serious difficulty in controlling behavior" required for commitment under Crane, then virtually

---

[4]Dr. Hanson was cited as a leading expert by all three of the Commonwealth's experts and the prosecutor. TR I 62-63, 189-90; II 25-28, 42; III 7-9, 71, 80-88, 96-97, 139.
    This Court may consider the applicable scientific literature in determining points of law, even where that literature was not cited below.  See Commonwealth v. Beausoleil, 397 Mass. 206 (1986); Commonwealth v. Vao Sok, 425 Mass. 787, 800-01 (1997).

[5]All scholarly articles cited herein which are available to counsel are reproduced in the addendum.

every sex offender is *ipso facto* committable, and <u>Crane</u> itself is meaningless. "Compulsive or obsessive behavioral disorders qualify as grounds for commitment, and other conditions may qualify as well." <u>Dutil</u>, 437 Mass. at 15. Mere lack of self-control does not.

  (c) *The trial court severely prejudiced Mr. McCoul by confusing impulsivity with compulsivity.*

  The difference is critical in the case at hand. Dr. Gans testified that Mr. McHoul "impulsively" grabbed a strange woman and kissed her in 1959. TR I 112. Dr. Schaefer described the governing offense as "extremely impulsive." TR II 55. Dr. Kelso quoted a 1998 annual treatment report stating that McHoul was "very impulsive and chooses not to make an effort to control those impulses." Kelso report, Commonwealth's RA at 110. He quoted a 1999 report stating that "Mr. McHoul continued to struggle with impulsivity." *Id.* at 119.

  On the other hand, Dr. Gans allowed that McHoul "is obviously able over time to control his behavior with people telling him what he needs to do and helping him keep track of that." TR II 23. She further stated that his continuing behavior towards women at the Center implied that "this is how he wants to relate to women, this is what he wants to do & he doesn't really care what happened." TR I 159. Dr. Shaefer later

---

He will provide the few remaining ones as they become

repeated that the reason McHoul hadn't committed sexual assaults at Treatment Center was that he would receive severe punishment if he did so. He then had the following exchange with counsel:

> Q:  "And you stated also that if he were in the community, he would be concerned about receiving severe punishments for crimes he might commit?"
> A:  "I believe so."

*Id.* at 74. The doctors thereby admitted that Mr. McHoul *can* control his impulses.

The prosecutor further described Mr. McHoul as impulsive rather than compulsive:

> Now I submit to you that Mr. McHoul has an idea how far he can go in a secure facility. And he takes it right up to the line, and he continues to do that. And that would be other evidence of Mr. McHoul's deviant arousal and his ability to incorporate this information if he chose to.

TR III 142. He added:

> Well, that simply goes back to Mr. McHoul being able to do the work. He can do it. He may not be able to do it all the time, but he can do it.
>                             ****
> He can do all of these things, but he chooses not to for one reason or another.

*Id.* at 143.

The court's improper instruction, combined with the experts' testimony and the prosecutor's closing argument, permitted jurors to commit on a mere finding of impulsivity, in the presence of testimony and argument by the Commonwealth admitting that he could control his sexual impulses.

_____

available to him.

>   (d)   *By confusing impulsivity with compulsivity,*
>         *the trial court rendered meaningless the*
>         *requirement that the jurors find Mr. McHoul's*
>         *crimes "repetitive or compulsive" in order*
>         *to commit.*

The instruction further compromised the requirement that Mr. McHoul's prior crimes have been "compulsive or repetitive" in order to civilly commit. G.L. c. 123A § 1. The trial court properly instructed the jurors that "[t]he Commonwealth does not have to prove that the sexual misconduct was both repetitive and compulsive." TR III 164. But by robbing the term "compulsive" of meaning, she removed any significance from the jury's finding of compulsiveness or repetition.[6]

2.   <u>The trial court committed reversible error by failing to instruct the jury that commitment required a finding of mental abnormality or personality disorder.</u>

In order to justify civil commitment, the States must "couple[] proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" <u>Kansas v. Hendricks</u>, 521 U.S. 346, 358 (1997). Commitment is constitutional only

---

[6]The jury might have found that the two sexual crimes of which Mr. McHoul were committed constituted a "repetitive" pattern. They might similarly have believed the hearsay testimony about other crimes. But there is no way to determine their thought processes. There remains the strong possibility that they based their verdict on the incorrect definition of "compulsivity" provided by the trial court.

13

while the individual is currently both dangerous and disordered. <u>Foucha v. Louisiana</u>, 504 U.S. 71 (1992).

In <u>Dutil, petitioner</u>, 437 Mass. 9, 15-16 (1992), the SJC tacitly conceded that the previous version of G.L. c. 123A did not, on its face, meet the <u>Hendricks</u> requirement.  It nonetheless held:

> the fact that G. L. c. 123A does not explicitly require "mental illness" or "mental abnormality" does not end our inquiry. Although the <u>Hendricks</u> case clearly requires a finding that the individual suffer from a present mental condition that creates a likelihood that the individual will engage in sexually dangerous conduct in the future, *id.*, 521 U.S. at 358, it does not demand the use of a specific term to describe the mental condition. *Id.*, 521 U.S. at 358-359 ("the term 'mental illness' is devoid of any talismanic significance"). General Laws c. 123A meets the *Hendricks* requirements if it implicitly requires this finding, even if it does not use the specific terms "mental illness" or "mental abnormality." We conclude that G. L. c. 123A, *as construed by this court*, requires such a finding.

(emphasis added). It concluded:

> Our decisions since 1988 have...required that the Commonwealth demonstrate present dangerousness ...*and the link of this dangerousness to a mental condition.*

*Id.* at 16 (emph. added).

Like Dutil, McHoul was originally committed under a previous version of G.L. c. 123A which did not, on its face, require proof of a mental condition. In 1999, the legislature rewrote the definition of "sexually dangerous person" incorporating the <u>Hendricks</u> "mental condition" requirement for persons facing initial commitment. G.L. c. 123A §1(i)&(ii). But it left out the mental condition requirement for previously

committed §9 petitioners, defining "sexually dangerous person" as:

> any person who has been... (iii) previously adjudicated as such by a court of the commonwealth and whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive sexual misconduct by either violence against any victim, or aggression against any victim under the age of 16 years, and who, as a result, is likely to attack or otherwise inflict injury on such victims because of his uncontrolled or uncontrollable desires.

*Id.*

The Commonwealth may argue that no particular nomenclature is required to prove the requisite mental disorder, <u>Dutil</u>, *supra*, and that the use of the phrase "general lack of power to control his sexual impulses" is sufficient to meet constitutional requirements. But the Statute permits current proof of this "general lack of power" to be established merely through a history of "repetitive" offenses. It therefore violates the central principle of <u>Dutil:</u>

> The statute requires that the "general lack of power to control" be evidenced by "repetitive or compulsive sexual misconduct." Dutil argues that this language permits commitment on dangerousness alone because nothing more than past "repetitive" conduct need be used to infer lack of control. At the time of Dutil's commitment in 1988, however, we had not construed the language of the statute in this manner. Civil commitment was not permitted based solely on an individual's past sexual conduct.

*Id.* at 15.

Unless applied "as construed by this court," *id.* at 14, the Statute fails to distinguish "a dangerous

15

sexual offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.'" <u>Crane</u>, <i>supra</i>, 534 U.S. at 212.  Under the trial court's instructions, however, the jury was allowed to to find that Mr. McHoul remained unable to control his sexual impulses merely because he was a repeat sexual offender.

Citing prior cases construing G.L. c. 123A in a constitutional manner, the <u>Dutil</u> court held:

> Although the judge who ordered Dutil's commitment did not specify the standard or evidence on which he relied in adjudging Dutil a sexually dangerous person, we assume that the judge correctly applied the controlling law to the facts before him.

437 Mass. at 16.

Mr. McHoul's case, however, was a jury trial, in which the trial court merely repeated the language of G.L. c. 123A § 1(iii) in her jury instructions, and failed to require proof of mental disorder. TR III 161, 163-64.  We may presume that the original judge who found Mr. McHoul sexually dangerous in 1974 took note of the cases construing the Statute to require proof of a link between the respondent's dangerousness and a mental condition, and "correctly applied the controlling law to the facts before him."  We can make no such presumption concerning a jury which was not

instructed regarding the constitutional requirements for commitment.[7]

Under Hendricks, Crane, and Dutil, McHoul's re-commitment must therefore be reversed.

3.  The trial court provided the jury with an overbroad definition of continued sexual dangerousness.

The trial court twice instructed the jurors that it could consider inferences from the evidence to determine "whether the Commonwealth has proven that the plaintiff continues to suffer from the psychological forces, conditions, problems, or other root causes that led him to commit these earlier acts of sexual misconduct." TR III 168.  This is not the appropriate standard.

---

[7] Further, unlike the case in Dutil, it appears that the Commonwealth was not required to prove mental disorder at the time of Mr. McHoul's original 1974 commitment. In reviewing that commitment, SJC merely quoted the then-existing statutory language in defining a "sexually dangerous person" as:

"Any person whose misconduct in sexual matters indicates a general lack of power to control his sexual impulses, as evidenced by repetitive or compulsive behavior and either violence, or aggression by an adult against a victim under the age of sixteen years, and who as a result is likely to attack or otherwise inflict injury on the objects of his uncontrolled or uncontrollable desires." In Peterson, petitioner, 354 Mass. 110, 117 (1968), we said that "[t]he statutory definition requires repetitive or compulsive behavior, violence or aggression by an adult against a person under the age of sixteen and a likelihood that injury will be [in]flicted."
Commonwealth v, McHoul ("McHoul II"), 372 Mass 11, 13-14 (1977). The decision makes no mention of mental defect or disorder of any kind.

We may fairly presume that every crime is the product of "psychological forces, conditions, problems, or other root causes."  Combined with the trial court's failure to require proof of a mental condition, this instruction, too, violated the constitutional requirement that the Statute distinguish him whose "serious mental illness, abnormality, or disorder subjects him to civil commitment" from "dangerous but typical recidivists." <u>Kansas v. Crane</u>, 534 U.S. at 413.

4.  <u>The Commonwealth is estopped from arguing that Mr. McHoul's committed his prior offenses due to an inability to control his sexual impulses where the Commonwealth previously argued and the courts found that he did not suffer from an "irresistible impulse" at the times he committed them.</u>

Massachusetts defines insanity in criminal cases in terms indistinguishable from those used to define sexual dangerousness: a defendant cannot be held criminally responsible absent "substantial capacity to control his conduct so as to be able to abstain from doing the unlawful act." <u>Commonwealth v. DeSalvo</u>, 353 Mass. 476, 478 (1968). The phrase "irresistible impulse" has been used to describe inability to control one's behavior in both insanity and SDP cases. *See* <u>McHoul I</u>, *supra*, 352 Mass. 344; <u>DeSalvo</u>, *supra*; <u>Davis, petitioner</u>, 383 Mass. 645 (1981).  *See also* <u>Hendricks</u>, *supra,* 521 U.S. at 375, 76.[8]

---

[8] "Hendricks' abnormality does not consist simply of a long course of antisocial behavior, but rather it includes a specific, serious, and highly unusual

Mr. McHoul's initial conviction for the governing offense herein, his sexual assault on a woman in 1966, was overturned due to the expert's and court's failure to include "irresistible impulse" as grounds for a finding of not guilty by reason of insanity. McHoul I, *supra*, 352 Mass. 544. Especially given Mr. McHoul's long record of alleged schizophrenia, he could not have been convicted of either his 1962 or 1966 offenses unless the Commonwealth proved that he did not suffer from an irresistible impulse making him substantially incapable of conforming his behavior to the law.

The Commonwealth may cite McHoul v. Commonwealth, 10 Mass. App. Ct. 878 (1980)(McHoul III), as dispositive of this issue. There, this Court held:

> The plaintiff's remaining arguments, both based on an alleged inconsistency between the finding of lack of "control" underlying his commitment and continued detention and the fact that he has been held criminally responsible in the past for sexual misconduct, overlook the fact that "lack [of] substantial capacity . . . to conform his conduct to the requirements of law," Commonwealth v. McHoul, 352 Mass. 544, 547 (1967), is only one of the elements which in combination (but not in isolation) negate criminal responsibility. They also overlook the fact that a proceeding under G.L. ch. 123A, § 9, second part, is directed, in part, toward determining ability to control one's

---

inability to control his actions.... The law traditionally has considered this kind of abnormality akin to insanity for purposes of confinement.[Cites omitted.] Indeed, the notion of an 'irresistible impulse' often has helped to shape criminal law's insanity defense and to inform the related recommendations of legal experts as they seek to translate the insights of mental health professionals into workable legal rules." *Id.*

sexual impulses at the time of the § 9 hearing,
not at the time (or times) of the earlier sexual
misconduct.

*Id.*

But McHoul III is based on a misinterpretation of
the very case it cites: McHoul I, where the Supreme
Judicial Court rejected the claim that "absence of
awareness of wrongdoing must accompany irresistible
impulse." 352 Mass. at 548. McHoul I quoted
Commonwealth v. McCann, 325 Mass. 510, 515:

> One whose mental condition is such that he cannot
> distinguish between right and wrong is not
> responsible for his conduct, and neither is one
> who has the capacity to discriminate between right
> and wrong but whose mind is in such a diseased
> condition that his reason, conscience and judgment
> are overwhelmed by the disease and render him
> incapable of resisting and controlling an impulse
> which leads to the commission of a homicide.

352 Mass. at 546.  The McHoul III court was simply
wrong to conclude that "lack of substantial capacity" –
or irresistible impulse – is insufficient, by itself,
to negate criminal responsibility.

Since the Commonwealth has pleaded and proved that
Mr. McHoul's crimes were not the product of an
irresistible impulse, it cannot be said that his
"misconduct in sexual matters indicates a general lack
of power to control his sexual impulses," as required
for commitment under G.L. c. 123A §1.

Further, sexual offender commitment laws meet
constitutional standards only when they are limited in
scope to those offenders whose mental disorders create

20

a "special and serious lack of ability to control behavior." <u>Crane</u>, 534 U.S. at 412-13. If McHoul was able to control his impulses at the time he committed his crimes, then they were not the product of such a special and serious lack of ability, and he should never have been deemed "sexually dangerous" in the first place.  Under these circumstances, it was constitutionally improper to ask a jury to determine whether he "remained" that which he never was.

The Commonwealth might find further grounds for argument in <u>Commonwealth v. Bruno</u>, 432 Mass. 489, 505-506 (2000), where the SJC permitted the filing of a second SDP petition fourteen years after the initial petition against the respondent was dismissed.  In <u>Bruno</u>, however, there was no prior judicial finding that the respondent was capable of resisting his impulses. Here, there was.

5.    <u>The trial court committed reversible error by admitting "totem pole hearsay."</u>

Under <u>Dep't of Youth Services v. a Juvenile</u>, 398 Mass. 516, 531 (1986) ("<u>DYS</u>"), hearsay testimony is inadmissible in evidence even as the basis of an expert's testimony.[9]  The Supreme Judicial Court held <u>DYS</u> applicable to SDP cases in <u>Commonwealth v. Markvart</u>, 437 Mass. 331 (2002), reiterating that:

---

[9]The expert can, of course, base his/her opinion on such hearsay, "without the facts or data being admitted in evidence." <u>Id</u>. at 532.

the qualified examiner's report must be redacted prior to its submission to the jury to exclude any facts or data that were not presented in evidence or elicited during the cross-examination of the qualified examiner. In short, an expert's direct examination is not a vehicle for the introduction of facts in evidence (other than those that the expert directly observed), and the qualified examiner's report should not be transformed into such a vehicle.

*Id.* at 339.

In Commonwealth v. Boyer, 58 Mass.App.Ct. 662, 666-67 (1993), the Appeals Court further explained the relationship between the prohibitions of DYS and Markvart and the seemingly permissive hearsay standards of G.L. c. 123A §14(c):

> That section lists a litany of classic hearsay evidence, e.g., probation records, police reports, psychiatric reports, etc., which "shall be admissible."...
> While § 14(c) trumps a hearsay objection to the admission of the report, still remaining is the issue of hearsay within the report. Traditional rules of evidence apply. When there is hearsay within hearsay it is commonly referred to as totem pole hearsay. "Generally, evidence based on a chain of statements is admissible only if each out-of-court assertion falls within an exception to the hearsay rule." [citations omitted.]
> If there is not an exception for each statement, the hearsay is not admissible substantively, so long as an objection is lodged.

In the case at hand, the Commonwealth's case was based largely on the sort of "totem pole hearsay" held inadmissible in Boyer.

Over objection, TR I 51-57, 67-69, the prosecutor and Commonwealth's experts alleged that McHoul had been charged with another sex crime in 1960 of which he was

22

acquitted but had allegedly admitted, and had committed another sex crime in 1965.[10]

Dr. Gans testified regarding her CAB report: "It lists also any other offenses, any kind of sex aggressive behavior that the petitioner might have engaged in, *or might not*. He might or might not have been convicted for it, but it is part of his history as sexually aggressive behavior." TR I 99 (emphasis added). She said that Mr. McHoul had grabbed a strange woman and kissed her in 1959. *Id*. at 112. She described the alleged 1960 offense, noting the acquittal, but nonetheless setting forth the alleged details because it was "in the record. *Id*. at 127. She also described in detail the alleged 1965 "lewd and lascivious" conduct incident in which Mr. McHoul was not charged. *Id*. at 127-28. In her account of McHoul's 1966 attempted rape conviction, she said "He has also spoken subsequently of the fact that though he was charged with attempted rape, he did in fact at some point, pull his penis out of her, which means he had to have inserted it in her." *Id*. at 108.

Dr. Schaefer quoted the 2002 CAB review quoting the 1978 Admission Report, claiming that in 1960 Mr. McHoul:

> delivered a Western Union message to an apartment. When a woman answered the door, he set upon her, grabbed her by the throat, and forced her to lie

---

[10]TR I 74, 77, 99, 127-28; II 59; 3/27 27-28, 68-69, RA 10-13, 35, 77, 79-81, 90-92, 96-97, 155-56, 161.

across the bed, opened the front of her pajamas and placed his mouth on her breast and lacerated same.  He assaulted her and discharged on her leg and compelled her to touch his genitals.

RA 81.  He cited the same sources to claim that:

An additional offense in 1965 for Lewd Person was filed.  In this offense, Mr. McHoul went to the apartment of a woman friend, talked of having sexual relations, and kissed her on the neck and back, at which point she fled.  Yet another offense occurred in 1966 and was referred to as Assault with Intent to Rape, which was dismissed.

*Id.*  These allegations are at best quadruple and possibly even quintuple hearsay, depending on which reports the assuming the writers of the 1978 Admission report relied.

The prosecutor, Dr. Gans, and Dr. Kelso referred to Mr. McHoul's "sexual fascination with his mother," and described it as a motivating factor in his sexual offending. TR I 77, 80, 129, 160; III 30-31; RA 89, 144.  Dr. Kelso said that:

Mr. McHoul was talking about that he used to have rape fantasies involving his mother as the victim in his fantasies.  And that he thought about the hatred his felt [sic] towards his mother.  And when he would think about that hatred, he would fantasize about punching or raping his mother, and that he then felt better.

TR III 30. But the only basis for this allegation was a hearsay claim that someone who did not testify heard Mr. McHoul discuss the matter at his 1999 annual review.  *Id.*

There was testimony that Mr. McHoul bit the nipple of another inmate during otherwise consensual sex. TR I 183; III 54-55, 160.  But no one testified to seeing

24

the event, being the victim, or overhearing McHoul's alleged conviction. The experts and prosecutor claimed that McHoul had admitted to continuing rape fantasies in a 2000 group session. TR I 125-26, 156; TR III 141. But no one present at the group session testified that the confession occurred.

Various experts testified to other people's conclusions that Mr. McHoul had failed to master treatment principles. Dr. Gans testified that the 1993 Restrictive Integration Review Board Report; 1996 CAB report, 1998 Annual Treatment Review, and 1999 Annual Treatment Review were incorporated in her report, but that she did not attempt to verify any of the facts alleged therein. TR I 187-88.

Approximately 48 pages of Dr. Kelso's 78 page report consist of inadmissible quotes and paraphrases from other people's reports.[11]

Perhaps the largest portion of hearsay was devoted to Mr. McHoul's alleged "boundary issues" with female staffers: his unfortunate tendency to stare at, fantasize about, and fall in love with women at the Treatment Center.[12]

---

[11] This total does not include hearsay regarding the crimes of which Mr. McHoul was convicted, which were admissible under Markvart and Commonwealth v. Given, 441 Mass. 741 (2004).

[12] TR I 78, 124-26, 146-49, 155-57, 159; II 17-23, 32-34, 63-64, 78; III 40-44, 49-138; RA 14-17, 20, 26-34,

    (a)   *As a matter of due process,* <u>Commonwealth v. Markvart</u> *specifically excludes from evidence hearsay allegations of crimes which did not result in convictions.*

<u>Markvart</u> most clearly applies to those alleged crimes for which McHoul was either acquitted or never charged. As this Court held:

> The Commonwealth argues that the Legislature's failure to add the words "conviction or adjudication" to "sexual offense" in § 14 (c)... demonstrates an intent that reports relating to unproven allegations of sexual offenses be admitted at trial. This argument is unpersuasive. As the motion judge correctly noted, "the term 'offenses' means a 'violation of the law' . . . and it is not clear whether the allegations in the [nol prossed] complaint are true and whether the defendant indeed violated the law." Our justice system presumes people innocent until they are proved guilty. Therefore, without a conviction or adjudication, the allegations in the nol prossed case materials are just that: allegations. They do not constitute reports of "prior sexual offenses." To speak of a defendant's prior "offenses" necessarily implies findings of guilt.
> ...[U]nless allegations are established as fact, it is not known whether complainants in fact are victims.

437 Mass. at 336. <u>Markvart</u> interpreted the Statute as it did to "address due process concerns and the right of confrontation." *id,* holding:

> We conclude that G. L. c. 123A, § 14 (c), does not render police reports and witness statements from nol prossed cases admissible at trial. They may be provided to a qualified examiner, and a qualified examiner may rely on them as the basis for an expert opinion, consistent with the requirements and limitations of <u>Department of Youth Servs. v. A Juvenile</u>, *supra. Those requirements and limitations suffice to address due process concerns and the right of confrontation.*

437 Mass. at 399 (Emphasis added).

---

37-38, 40-42, 44, 51, 83-86, 100, 104-05, 108-12, 118-

Here, Dr. Gans referred to "group notes" indicating that Mr. McHoul had admitted to the alleged 1960 and 1965 offenses. TR I 114-21. But while testimony from someone who claimed to have heard the alleged remark would have been admissible, hearsay from a third person about what Mr. McHoul allegedly said to somebody else clearly failed the Boyer/ Markvart test.

All of this "other crimes" hearsay was highly prejudicial. Dr. Gans quoted from Hanson & Bussiere's 1998 meta-analysis:

> One of the simplest is most [sic] defensible approaches to recidivism prediction is to identify a stable pattern of offending. Behavior is influenced by a variety of internal & external factors that can and do change over the life course. Nevertheless, it does not take any special expertise to predict with confidence the continuation of any behavior that has occurred frequently in many different contexts and despite the best efforts to stop it.

TR II 25-26. The jury might not have considered McHoul's two convictions "behavior that has occurred frequently in many different contexts and despite the best efforts to stop it." But combined with the other, uncharged offenses, they provide a portrait of someone who not only presents a textbook example of Hanson & Bussiere's principle, but who is far scarier than the Commonwealth had any right to portray him.

(b)  *Boyer* and *Markvart* exclude the use of multiple hearsay allegations within otherwise admissible reports for any and all purposes.

20, 125, 128-138, 157-160.

At first glance, <u>Boyer</u> seems to contradict <u>DYS</u> and <u>Markvart</u> by holding that such hearsay "may be admissible if used for an alternative purpose, i.e., by an expert in forming his opinion." 58 Mass.App.Ct. at 667. The cases are easily reconciled, however.

While rejecting Proposed Mass. R. Evidence 703, the Court in <u>DYS</u> approved Proposed Mass. R. Evidence 705,[13] noting that "[t]he thrust of the rule is to leave inquiry regarding the basis of expert testimony to cross-examination., which is considered an adequate safeguard." <u>Markvart</u> explains:

> Consistent with the principles articulated in <u>Department of Youth Servs. v. A Juvenile</u>, *supra*,...the qualified examiner's report must be redacted prior to its submission to the jury to exclude any facts or data that were not presented in evidence *or elicited during the cross-examination* of the qualified examiner.

437 Mass. at 338-39 (emphasis added).

Read together with <u>Markvart</u> and <u>DYS</u>, <u>Boyer</u> thus indicates that otherwise inadmissible hearsay may be admitted to explain the expert's opinion, but only when raised in cross-examination by the opposing party. The trial court herein erred by admitting such hearsay on direct examination of the Commonwealth's experts, and by refusing to redact it from the experts' reports.

---

[13] "The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

6.   <u>There was insufficient evidence to commit in that
     the experts failed to diagnose Mr. McHoul with a
     "mental abnormality or personality disorder" that
     might justify commitment.</u>

As noted *supra*, the trial court committed

reversible error by failing to instruct jurors that

commitment required proof of a "mental abnormality or

personality disorder." Even had the court given the

proper instruction, however, reversal would be required

because the experts failed to diagnose Mr. McHoul with

any mental condition justifying commitment.

Dr. Gans mentioned that McHoul had been "diagnosed

early on as schizophrenic and carries that diagnosis

pretty consistently through to today." TR I 133. She

added that he had been diagnosed "at times" with

antisocial personality disorder ("APD"). She then

testified that various aspects of Mr. McHoul's

character or behavior were consistent with APD. *Id.* at

190; TR II 14.[14]

Dr. Kelso and Dr. Schaefer made no mention of

mental disorders in testimony, but documented prior

diagnoses of schizophrenia in their reports. RA 79-80,

83, 85, 90, 93, 98-99, 101, 107-08, 127, 153. Dr. Kelso

quoted a 1959 reference to "sudden unpredictable

periods of regression to a concrete autistic level of

functioning. RA 90.  Kelso quoted a 1996 annual

_____

[14] She further testified that "he's been diagnosed with
hydrocephaly, which means having a large head," but
added that "Those things get better and better as the
years go by." *Id.* at 134.

treatment report stating that "He has had multiple diagnoses over the years to include schizophrenia, schizoid personality disorder and sociopathic disorder," RA 107, but also noted an earlier report finding no psychosis. RA 100. Schaefer made no attempt at current diagnosis. Kelso's sole effort at diagnosis was limited to the following statement in his report:

> Mr. McHoul experiences deficits in his intellectual functioning, probably the result of some combination of his hydrocephalus, multiple head injuries, and occasionally psychotic (or psychotic-like) thinking. These deficits have negatively impacted on Mr. McHoul's progress in treatment.

RA 162. He did not link this choice of probable diagnoses to Mr. McHoul's alleged likelihood of reoffense. He did not testify to these possible diagnoses in court.

By relying on others' past diagnoses instead of diagnosing Mr. McHoul themselves, the experts rendered the Commonwealth's case insufficient for commitment. Hendricks, *supra*; Dutil, *supra*.

7.    A diagnosis of antisocial personality disorder is insufficient grounds for commitment.

Even if Dr. Gans had personally diagnosed Mr. McHoul with APD, such a diagnosis would have been insufficient grounds for commitment.[15] As explained in Kansas v. Crane, *supra*:

---

[15] In a one-sentence footnote in Commonwealth v. Reese, 438 Mass. 519, 526, n.9 (2003), the SJC found APD "adequate to satisfy the definitional requirements of a

> *Hendricks* underscored the constitutional
> importance of *distinguishing a dangerous*
> *sexual offender subject to civil commitment*
> *"from other dangerous persons who are perhaps*
> *more properly dealt with exclusively through*
> *criminal proceedings."* That distinction is
> necessary lest "civil commitment" become a
> "mechanism for retribution or general
> deterrence" — functions properly those of
> criminal law, not civil commitment. *cf. also*
> Moran, The Epidemiology of Antisocial
> Personality Disorder, 34 Social Psychiatry &
> Psychiatric Epidemiology 231, 234 (1999)
> (noting that 40%-60% of the male prison
> population is diagnosable with Antisocial
> Personality Disorder).

534 U.S. at 413.[16] The Court thus seems to have endorsed

the plurality holding in <u>Foucha</u>, *supra*, 504 U.S. at 86-

87 (1992):

> [T]he state asserts that because Foucha once
> committed a criminal act and now has an antisocial
> personality that sometimes leads to aggressive
> conduct..., he may be held indefinitely. This
> rationale would permit the State to hold
> indefinitely any other insanity acquittee not

---

sexually dangerous person" as set forth in G.L.c 123A §
1. It made no claims regarding its constitutional
adequacy, however.

In <u>Commonwealth v. Torres</u>, 437 Mass. 460, 463
(2002), on the other hand, the SJC found that
"[a]ntisocial personality disorder generally does not
constitute a mental disease or defect that could negate
criminal responsibility." Since, as noted *supra*, the
same definition applies to lack of criminal
responsibility in criminal cases and lack of power to
control in SDP cases, APD must be just as inadequate to
prove the former as the latter.

[16]Another expert cites studies estimating that 75
percent of those in prison and 25 percent of the
general population could be diagnosed with personality
disorders. Janus, "Foreshadowing the Future of <u>Kansas</u>
<u>v. Hendricks</u>: Lessons from Minnesota's Sex Offender
Commitment Litigation," 92 Nw.U.L.Rev. 1279, 1291 n.59
& 60 (1998). Whether Janus' or Moran's numbers are more
accurate, "[s]uch high prevalence estimates raise
important questions about the validity of the diagnosis
and the medicalisation of criminality." Moran, *supra*,
at 234.

mentally ill who could be shown to have a personality disorder that may lead to criminal conduct. The same would be true of any convicted criminal, even though he has completed his prison term.

*Id.* at 86-87.

The <u>Foucha</u> plurality's opinion is mirrored by leading civil commitment experts in both psychology and law. Prof. John Kip Cornwell has cautioned:

Because researchers have speculated that a majority of prison inmates suffer from this disorder, constitutionalizing the commitment of those with antisocial personalities would give states broad authority to civilly detain prisoners at the end of their sentences.

Cornwell, "Understanding the Role of the Police and Parens Patriae Powers in Involuntary Civil Commitment before and after Hendricks," 4 Psychology, Public Policy, and Law 377, 397 (1998) at 397. Prof. Stephen Morse wrote:

[I]f anyone who has a tendency to engage in sexual violence is abnormal, then the term 'mental abnormality' is circularly defined and does no independent conceptual or causal work. Moreover, such a definition collapses all badness into madness.

He concluded:

[I]t is almost unimaginable that a person whose sole diagnosis was 'antisocial personality disorder' and who was potentially dangerous would be committed involuntarily.

Morse, "Blame and Danger: An Essay on Preventive Detention," 76 B.U. L. Rev. 113, 126 (1996)

In its *amicus* brief in <u>Barefoot v. Estelle</u>, 463 U.S. 880 (1983), the American Psychiatric Association,

compiler and publisher of the Diagnostic and

Statistical Manual of Mental Disorders, explained:

> A medical diagnosis of antisocial personality
> disorder is in essence a descriptive label for
> past aberrant behavior of a particular type.

Prof. Moran, the expert cited in Crane, adds:

> The emphasis that the definition of the disorder
> places on antisocial acts means that antisocial
> personality disorder overlaps greatly with
> criminality.

Moran, *supra,* 34 Social Psychiatry & Psychiatric

Epidemiology at 233.   Becker and Murphy wrote in "What

we Know and Do Not Know about Assessing & Treating Sex

Offenders":

> In our opinion, sexual predator laws should not be
> applied to these nonparaphilic individuals. The
> prime example is the individual with an antisocial
> personality disorder who may commit an occasional
> sex offense as part of his or her overall pattern
> of norm--violating behavior. These individuals do
> not have a recurrent pattern of sexually
> disordered behavior and would not appear to be
> appropriate for sexually violent predator
> programs.   There is clear evidence that
> psychopathy (a subset of antisocial personality
> disorders) is a risk factor for reoffending among
> paraphilic individuals. This fact should not lead
> to the conclusion that the presence of an
> antisocial personality disorder should lead to
> civil commitment in the absence of a paraphilia
> diagnosis.

4 J. Psychol, Public Policy, & the Law 116, 118

(1998).[17]

---

[17] Or, as the Association for the Treatment of Sexual
Abusers ("ATSA"), wrote in its *amicus curiae* brief in
Hendricks:
> The presence of an antisocial personality disorder
> in and of itself is not sufficient to meet the
> criteria for sexual predator laws. The presence of
> a diagnosis of antisocial personality with
> paraphilia, though, is well--established as

A diagnosis of APD thus merely repeats through a psychologist what the law already knows: that the respondent has a lengthy history of bad behavior.[18] It does not "narrow[] the class of persons eligible for confinement to those who are unable to control their dangerousness." Hendricks, supra, 521 U.S. at 358.

In his concurrence to Hendricks, id. 521 U.S. at 373, Justice Kennedy warned:[19]

> [I]f it were shown that mental abnormality is too imprecise a category to offer a solid basis for concluding that civil detention is justified, our precedents would not suffice to validate it.

Another expert has similarly stated:

> At some level, virtually all of those who choose to commit criminal acts, especially those who commit unusually violent or otherwise abhorrent crimes (like sexual assaults on children) can be considered 'abnormal.'

Carol S. Steiker, "Forward: The Limits of the Preventative State," 88 J. Crim. L. & Criminology 771, 786 (1998).[20]

---

increasing the person's risk of offending and dangerousness.

[18]See also Hubbart v. Superior Court, 969 P.2d 584, 611-12 (Cal.) (Werdegar, J., concurring):
To the extent the diagnosis simply places a psychiatric label on a particular character structure or a generalized propensity to do ill, Foucha's warnings assume more immediate constitutional significance.

[19]Justice Kennedy provided the crucial fifth vote for the majority decision in Hendricks.

The requirement that the Commonwealth distinguish SDPs "from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings" is meaningless if antisociality equals disorder. As the Supreme Court stated in <u>Cummings v. Missouri</u>, 71 U.S. 277, 325 (1867):

> what cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name....

*Accord,* <u>U.S. Term Limits, Inc. v. Thornton</u>, 514 U.S. 779, 829 (1995). If there can be no commitment based solely on prior bad conduct, there cannot be commitment based on a diagnosis derived solely from prior bad conduct.

---

[20]Other experts repeat these warnings. As noted by Dr. Robert Wettstein, former President of the American Academy of Psychiatry and the Law:

> Another danger is that "mental abnormality" will be established in a circular manner only by virtue of the sexual offending behavior itself. In that case, the abnormality is derived from the sexual behavior which in turn is used to establish the predisposition to other sexual behavior.

Wettstein, "A Psychiatric Perspective on Washington's Sexually Violent Predators Statute," 15 U. Puget Sound L. Rev. 597, 602 (1992). Dr. John Monahan, professor of law and of psychology and legal medicine at the University of Virginia and founding president of the American Psychological Association Division of Psychology and Law, agrees:

> Note that if one considers all repetitive violent offenders to have a serious mental disturbance, one has reduced the concept of mental disturbance to a tautology.

Monahan, <u>The Clinical Prediction of Violent Behavior</u>, U.S. Dept. of H.H.S. Public Health Service (1981) at 4.

Recent scholarship indicates that the presence of APD cannot distinguish specifically sexual offenders from other recidivists. In "Predictors of Sexual Recidivism: An Updated Meta-Analysis,"[21] Dept. of Public Safety and Emergency Preparedness Canada (2000) at 9, Hanson & Morton-Bourgon found that:

> Antisocial orientation (antisocial personality, antisocial traits, history of rule violation) was the major predictor of violent non-sexual recidivism (d. = .51), violent (including sexual) recidivism (d. = .54), and any recidivism (d. = .52).

On the other hand, the authors found antisocial orientation a relatively weak predictor of sexual reoffense, with a value of d. = .23. *Id.* at 8.[22]  The implications of the meta-analysis are clear: APD is relevant to sexual reoffense only among those sex

---

[21]The Meta-Analysis is a review of 95 different studies involving more than 31,000 sexual offenders, with an average follow-up time of over six years. It is an update of the Hanson article cited by all three Commonwealth's experts herein. *See* pp. 6, 28-29, TR III 80-88, *supra.*

[22]The authors explained:
The primary consideration when estimating the importance of a risk predictor is the size of its relationship with recidivism, as indicated by the median d values and the weighted average (d.). According to Cohen (1988), d values of .20 are considered 'small', values of .50 are considered 'medium' and values of .80 are considered 'large'. *Id.* at 6. And further:
d measures the average difference between the recidivists and the non-recidivists, and compares this difference to how much recidivists are different from other recidivists, and how much non-recidivists are different from other non-recidivists.
*Id.*

offenders who are *not* distinguishable "from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." <u>Hendricks</u>, *supra,* 521 U.S. at 360; <u>Crane</u>, *supra,* 534 U.S. at 413.[23]

8.    <u>The Equal Protection Clause forbids commitment of a schizophrenic under G.L. c. 123A rather than G.L. c. 123</u>.

In <u>Newton, petitioner</u>, 357 Mass. 346, 352 (1970), the Supreme Judicial Court found no need to seek commitment of a schizophrenic under G.L. c. 123, the standard commitment statute for the mentally ill, as opposed to G.L. c. 123A, the SDP statute. But <u>Newton</u> preceded <u>Humphrey v. Cady</u>, 405 U.S. 504, 512 (1972), where the Supreme Court held:

> An alternative justification for the discrimination [between two classes of persons subject to commitment] might be sought in some special characteristic of sex offenders.... It appears, however, that the Mental Health Act and the Sex Crimes act are not mutually exclusive; that "aberrations" warranting commitment under the latter might also amount to "mental illness" under the former. The equal protection claim would seem

---

[23] Hanson and Morton-Bourgon found among the 31,000 sex offenders included in the meta-analysis:

> On average, the observed sexual recidivism rate was 13.7% (n = 20,440, 84 studies), the violent non-sexual recidivism rate was 14.0% (n = 7,444, 27 studies), the violent recidivism rate (including sexual and non-sexual violence) was 25.0% (n = 12,542, 34 studies) and the general (any) recidivism rate was 36.9% (n = 13,196, 56 studies).

*Id.* at 8. In other words, sex offenders are far more likely to recidivate non-sexually than sexually. Only those who are specifically likely to commit new *sexual* offenses can be considered distinguishable from standard recidivists. A diagnosis of APD does not permit any such distinction.

to be especially persuasive if... petitioner was deprived...procedural protections, merely by the arbitrary decision of the state to seek his commitment under one statute rather than the other.

Similarly, in <u>Jackson v. Indiana</u>, 406 U.S. 715, 730 (1972), the Court held:

that by subjecting Jackson to a more lenient commitment standard and to a more stringent standard of release than those generally applicable to all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release...Indiana deprived petitioner of equal protection of the laws under the Fourteenth Amendment.

This Court mirrored the language of <u>Humphrey</u> and <u>Jackson</u> in <u>Andrews, petitioner</u>, 368 Mass. 468, 480-81 (1975):

[M]any SDPs could be proceeded against under either statute....
    In view of the generally similar functions and effects of c. 123A, § 6, and c. 123, § 18, the Commonwealth is constitutionally bound to extend substantially similar procedural and substantive safeguards to persons affected by either statute.

"Dangerous persons" held under G.L. c. 123 are committed for a fixed period of time, not to exceed one year. G.L. c. 123 §8(d). Commitments under G.L.c. 123A, however, are for "a minimum of one day and a maximum of [the] person's natural life." G.L. c. 123A §14(d).

Neither <u>Humphrey</u> nor <u>Jackson</u> has any meaning if Mr. McHoul is subjected to the risk of permanent commitment merely by the Commonwealth's decision to seek commitment under one statute rather than the other. If

38

G.L. c. 123A is to be constitutional, there can be no "overlap" giving the State the choice of proceeding against particular individuals under either it or G.L. c. 123.

In Dutil, petitioner, *supra,* 437 Mass. at 21, this Court held:

> Detainees under G. L. 123 are entitled to an automatic annual review, while those under G. L. c. 123A must file a petition to exercise their right to an annual review. However, we have already determined that this difference in procedure does not violate equal protection. *See* Thompson, petitioner, 394 Mass. 502, 507, 476 N.E.2d 216-508 (1985).

This Court thereby misapprehended the differences between the two statutes. A G.L. c. 123 §4 review is a strictly internal matter held "under the supervision of the superintendent." The court is not involved. It is meant to consider only the conditions under which the person is held, a competency evaluation, and management of the person's finances. It cannot result in the extension or termination of the commitment itself.[24] As noted above, the commitment itself terminates no later than a year after it begins. G.L. c. 123 §8(d), *supra.*

The legislature has thus contrived to do precisely what it may not do under the Equal Protection Clause: condemn persons such as Mr. McHoul "to a more stringent standard of release than those generally applicable to

---

[24] *See also* Commonwealth v. Davis 407 Mass. 47, 51, n.1 (1990): "The purpose of the annual review under c. 123 is to determine whether confinement in a less

all others not charged with offenses, and by thus condemning him in effect to permanent institutionalization without the showing required for commitment or the opportunity for release." <u>Jackson</u>, *supra*, 406 U.S. at 730.

9.  <u>The trial court erred by failing to require a unanimous verdict.</u>

The trial court did not require a unanimous verdict, TR III 173. This was error creating a serious possibility of a miscarriage of justice.

Current G.L.c. 123A § 14(d) requires a unanimous verdict for original commitments. § 9, the discharge section, however, retains the language of the old statute: "If a jury trial is demanded, the matter shall proceed according to the practice of trial in civil cases in the superior court." In <u>Sheridan, petitioner</u>, 422 Mass. 776, 780-81 (1996), the SJC interpreted this language to mean that "the jury in a c. 123A proceeding need not reach unanimity, if five-sixths of the jurors agree on a verdict." At that time, there was no right to a jury in an original commitment trial. *See* prior G.L.c 123A §§ 5. <u>Dutil</u>, *supra,* requires the same definition of sexual dangerousness and burden of proof at both original commitments and discharge hearings. 437 Mass. at 11.

restrictive facility is warranted.  <u>Thompson, petitioner</u>, *supra* at 508."

40

There is no rational basis for permitting the same definition and same burden to be determined by a smaller percentage of jurors in one hearing than the other. As a matter of statutory construction, due process, and equal protection, Sheridan cannot apply to discharge hearings following the 1999 amendments to the statute.

The equal protection issue looms especially large for those like Mr. McHoul who were originally committed under the old statute. Unlike their brethren under the new law, their indefinite commitment has never been the product of a jury verdict. The court in this case need not consider whether persons deprived of a jury in their pre-1990 original commitment trials were denied equal protection.[25] But there is no rational basis for denying them the right to unanimous juries in discharge trials that they would have were they facing initial commitment today.

10.   The question of whether McHoul "remained" an SDP was improper in that his initial commitment  was purposeless under Commonwealth v. Shedlock and thus unconstitutional.

Statutes interfering with personal liberty must be narrowly tailored to further a legitimate and compelling governmental interest. Bruno, supra, 432 Mass. at 503. Due process requires that "the nature and duration of commitment bear some reasonable relation to

---

[25] The issue was not raised in Dutil.

the purpose for which the individual is committed."
<u>Jackson v. Indiana</u>, *supra,* 406 U.S. at 728.

Our Appeals Court held in <u>Commonwealth v. Shedlock</u>, 58 Mass.Ct.App. 445, 452 (2003):

> It would appear evident beyond the need for demonstration that the public requires no protection from potentially dangerous sexual predators so long as they remain incarcerated, for whatever reason, after their sexual offense sentence has come to an end. Nor is such protection needed at any time prior to their actually being reintegrated into the community on the occasion of their physical release from all restraint and confinement.

Under <u>Shedlock</u>, the Commonwealth lacks a compelling interest in committing anyone who would not otherwise be released. There was thus no constitutional basis for McHoul's original 1974 commitment. Any subsequent hearing, including the instant trial, has concerned the wrong issue: whether Mr. McHoul "remains" sexually dangerous, G.L. c. 123A §9. If at any time since the end of his sentence the Commonwealth has thought Mr. McHoul sexually dangerous, it had a duty to proceed under the initial commitment procedures of G.L. c. 123A §§12-14 rather than under §9.

The definition of "sexually dangerous person" in G.L. c. 123A §1 clarifies the substantial differences between these two proceedings. As noted *supra,* subsection (i) requires proof of a current mental defect making the individual likely to commit a new sexual crime unless confined to a secure facility. Subsection (iii) allows continued commitment for

previously adjudicated SDPs upon proof of no more than "misconduct in sexual matters indicat[ing] a general lack of power to control his sexual impulses."

Prior to the reinstatement of new SDP commitments in 2000, the SJC found a rational relationship for continued commitment under the old Statute even after commitment was abolished for new inmates. <u>Commonwealth v. Tate</u>, 424 Mass. 236, 239 (1998).[26] Following <u>Shedlock</u>, there can no longer be a rational basis for upholding the initial commitment of one group while prohibiting it for another when the community, at that time, required protection from neither.

### CONCLUSION

For all the above reasons, the verdict finding Mr. McHoul still a sexually dangerous person must be reversed.  Mr. McHoul must be found not sexually dangerous and released due to the Commonwealth's failure to prove that he suffers from a mental abnormality or personality disorder sufficient for commitment under G.L. c. 123A.


Respectfully submitted,

---

[26] The Court in <u>Tate</u> said "[a] rational justification for keeping the defendant in the treatment center now may be found in the benefits that a person already in the treatment center may receive from continuing treatment." <i>Id.</i> at 240. But while many of us might benefit from treatment, the existence thereof does not constitute a narrowly tailored response to a compelling reason for locking us up in a secure facility. <u>Bruno</u>, <i>supra.</i>  <u>Tate</u> can no longer be considered good law.

James McHoul, appellant,
by his attorney,


David Hirsch, BBO # 600915
COMMITTEE FOR PUBLIC COUNSEL
SERVICES
44 Bromfield St.
Boston, Massachusetts 02108
(617) 482-6212

Westlaw.

815 N.E.2d 1104 (Table)                                                                                    Page 1
62 Mass.App.Ct. 1104, 815 N.E.2d 1104 (Table), 2004 WL 2238562 (Mass.App.Ct.)
**Unpublished Disposition**
**(Cite as: 62 Mass.App.Ct. 1104, 815 N.E.2d 1104, 2004 WL 2238562 (Mass.App.Ct.))**

**H**

**Briefs and Other Related Documents**

NOTICE:   THIS IS AN UNPUBLISHED OPINION.

Appeals Court of Massachusetts.
Larry A. DAVIS,
v.
COMMONWEALTH.
**No. 03-P-657.**

Oct. 5, 2004.

MEMORANDUM AND ORDER
PURSUANT TO RULE 1:28
**\*\*\*1** The petitioner, Larry Davis, appeals from an order of the Superior Court denying his petition for release from the Massachusetts Treatment Center pursuant to G.L. c. 123A, § 9. His primary claim is that the judge who presided over the hearing erred in excluding portions of the report prepared by the petitioner's expert witness. The petitioner raises ancillary claims in a separate pro se brief, and in another brief filed by counsel pursuant to *Commonwealth v. Moffett*, 383 Mass. 201 (1981), pertaining to substantive due process and equal protection. We address the claims in turn. [FN1]

> FN1. Arguably the case is moot, given that the remedy the petitioner seeks--a new trial (see petitioner's brief at 12)--is already available to him, as G.L. c. 123A, § 9, entitles an individual held at the Treatment Center to a yearly examination of dangerousness. Nonetheless, we

prescind the issue of mootness and consider the petitioner's claims, recognizing that an issue such as the permissible content of an expert's report may arise again in a future hearing.

1. *Admissibility of report.* The judge allowed in evidence so much of the petitioner's expert's report that addressed the petitioner's sexual dangerousness. The judge excluded those portions of the report that addressed the opinions of those who had previously determined the petitioner to be sexually dangerous. The petitioner argues this exclusion deprived him of the opportunity to attack the credibility of the Commonwealth's experts.

The claim is without merit simply because the petitioner's expert's report is inadmissible hearsay. See *Commonwealth v. Reese*, 438 Mass. 519, 527 (2003). The petitioner's expert is not a "qualified examiner" as that term is defined by G.L. c. 123A, § 1, as amended by St.1993, c. 489, § 1. Therefore, there is no specific exception provided in § 9 for his report. Thus, while his report may be deemed to fall into the so-called "catch-all" provision of § 9, as amended by St.1993, c. 489, § 7 ("any other evidence that tends to indicate that [the petitioner] is a sexually dangerous person shall be admissible"), there must nonetheless be an independent basis for admissibility. See *Commonwealth v. Reese, supra.* Here, there was no such independent basis for admissibility. [FN2] Thus, the report should have been excluded in its entirety. [FN3]

> FN2. We recognize that *Reese* addressed sexual dangerousness

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

815 N.E.2d 1104 (Table)                                                                 Page 2
62 Mass.App.Ct. 1104, 815 N.E.2d 1104 (Table), 2004 WL 2238562 (Mass.App.Ct.)
**Unpublished Disposition**
**(Cite as: 62 Mass.App.Ct. 1104, 815 N.E.2d 1104, 2004 WL 2238562 (Mass.App.Ct.))**

trials conducted pursuant to G.L. c. 123A, § 14, as opposed to hearings on petitions for release conducted pursuant to § 9. The distinction is immaterial, as the exact same statutory language appears in each section.

FN3. The judge did not have the benefit of *Commonwealth v. Reese,* 438 Mass. at 527, at the time of the hearing. But see *Commonwealth v. Boyer,* 58 Mass.App.Ct. 662, 666 (2003) (parole report properly admitted under "catch-all" exception of G.L. c. 123A, § 14[*c* ], but totem pole hearsay in report upon which judge relied should not have been considered substantively); *Commonwealth v. Morales,* 60 Mass.App.Ct. 728, 730 (2004) (DSS report and grand jury minutes admissible under "catch-all" exception of G.L. c. 123A, § 14[*c* ], but certain hearsay statements in reports and minutes were not independently admissible and should have been redacted).

Putting aside the hearsay issue, we note in passing that the portions of the report that the judge excluded were likely inadmissible in that they addressed irrelevant matters (the methodology of deoxyribonucleic acid [DNA] testing in paternity disputes), engaged in a critique of the specific findings of the Commonwealth's experts (as distinguished from a generalized attack on their scientific methods, [FN4] see *Commonwealth v. Kendall,* 9 Mass.App.Ct. 152, 159 n. 12 [1980] ), rendered the petitioner's expert's opinion on Supreme Court case law, and discussed in detail (more than four single spaced pages) a particular study upon which the petitioner's

expert relied.

FN4. It is also worth noting that the petitioner's expert's report attacked the "clinical" method, while the Commonwealth's experts never testified they utilized this method; rather, one testified he used the "guided clinical" method (a different approach), and the other testified he evaluated the petitioner "guided by factors which have been identified by previous research as associated with increased risk for a sex offender committing a future sex offense." (Tr. IV/121; V/10-11)

The petitioner also argues that, irrespective of the admissibility of his expert's report, the scope of the expert's testimony was impermissibly limited. This claim lacks merit. The petitioner cites a single instance in the transcript where the petitioner's expert began to discuss the clinical method, counsel for the Commonwealth objected, and the judge sustained the objection. But the objection was properly sustained because the response by the petitioner's expert was well beyond the scope of the question. [FN5] Following the ruling on the objection, counsel for the petitioner did not revisit the issue, but instead moved on. There was no error.

FN5. Counsel for the petitioner had asked, "what were the changes that were noted in Mr. Davis that helped in formulating your opinion?" The petitioner's expert responded that he had noted the petitioner's "understanding and the way he communicates and writes and describes his offenses and his understanding of his history of his life." (Tr. V/140) But the expert went

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

62 Mass.App.Ct. 1104, 815 N.E.2d 1104 (Table), 2004 WL 2238562 (Mass.App.Ct.)
**Unpublished Disposition**
**(Cite as: 62 Mass.App.Ct. 1104, 815 N.E.2d 1104, 2004 WL 2238562 (Mass.App.Ct.))**

on to say, "These are very weak predictors, though, and the court needs to know that clinical judgment about such factors have never been shown." It is at this point that counsel for the Commonwealth objected. (Tr. V/140)

**\*\*\*2** 2. *Remaining issues.* The other issues raised by the petitioner also are without merit, and require little discussion. The previous version of c. 123A, under which the petitioner was committed, is not unconstitutional. See *Dutil, petitioner,* 437 Mass. 9, 13-19 (2002). The statement by the court in *Dutil* that the former version of the statute "requires the Commonwealth to prove a present mental condition that results in uncontrolled sexual impulses," *Dutil, supra* at 16, nullifies any equal protection issue. [FN6] In spite of the petitioner's invitation, even if we were inclined to disregard the holdings of the Supreme Judicial Court--we are not--we have not the authority to do so. In any event, there was evidence that the petitioner did meet the definition of a sexually dangerous person as that term is defined in the "new" version of c. 123A. Thus, it is difficult to see what prejudice could have resulted.

> FN6. We recognize that the court in *Dutil, supra* at 21-22, chose not to address specifically the equal protection issue, since the petitioner had not raised it below. But the court's analysis--that the former version of the statute "requires the Commonwealth to prove a present mental condition that results in uncontrolled sexual impulses," *id.* at 16, goes to the heart of the present petitioner's equal protection claim that, unlike the present version of c. 123A, "people committed under the

former version of G.L. c. 123A can be denied discharge without any finding of a mental disorder." (Petitioner's *Moffett* brief at 4.) Thus, in accordance with *Dutil, supra,* the statute does not deny the petitioner equal protection.

*Order denying petition for release affirmed.*

62 Mass.App.Ct. 1104, 815 N.E.2d 1104 (Table), 2004 WL 2238562 (Mass.App.Ct.) Unpublished Disposition

### Briefs and Other Related Documents (Back to top)

• 2004 WL 3198711 (Appellate Brief) Supplemental Brief and Record Appendix for the Petitioner on Appeal from the Suffolk Division of the Superior Court Department (Feb. 01, 2004)

• 2004 WL 3198710 (Appellate Brief) Supplemental Brief, Addendum and Appendix of Respondent/Appellee (Jan. 01, 2004)

• 2004 WL 3198712 (Appellate Brief) Moffett Brief and Record Appendix for the Petitioner (Jan. 01, 2004)

• 2003 WL 24014075 (Appellate Brief) Brief and Addendum of Respondent/Appellee (Nov. 18, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.